In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 06-2745 & 06-3424

ANA M. SANCHEZ,

*Petitioner,*

*v.*

PETER D. KEISLER, Acting Attorney General
of the United States,

*Respondent.*

———————

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A77 656 255

———————

ARGUED APRIL 2, 2007—DECIDED OCTOBER 4, 2007

———————

Before RIPPLE, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* In 2005, Congress amended the Violence Against Women Act ("VAWA") to make it easier for victims of domestic abuse who face removal from the United States to file motions to reopen their immigration proceedings. See Pub. L. No. 109-162, 119 Stat. 2960 (2005). Ordinarily, strict time limitations apply to these motions. See 8 C.F.R. § 1003.2(c)(2). For persons qualifying under VAWA, however, Congress has lengthened the period within which a motion to reopen may be filed, has altered the numerical limit that applies to ordinary motions, and has provided for a stay of removal upon the filing of the motion. See 8 U.S.C. §§ 1229a(c)(7)(C)(iv)(III)

(time), 1229a(c)(7)(A) & (C)(iv) (numerical limit), 1229a(c)(7)(iv) (stay). When Ana Sanchez tried to take advantage of this law, however, she was rebuffed by the Board of Immigration Appeals. The BIA found that her motion to reopen was barred by the 90-day time limitation set forth in 8 U.S.C. § 1003.2(c)(2); it rejected her effort to invoke the special rules for battered spouses, finding that she should have raised this point before the immigration judge (IJ) and further finding that her counsel's failure to do so did not prejudice her. The BIA ruled, in the alternative, that it would deny even a proper motion to reopen from Sanchez in the exercise of its discretion.

We conclude that the BIA's first two reasons for denying the motion to reopen were based on legal error; VAWA permits the filing of a motion to reopen such as Sanchez's, and the Board has the independent power to accept such a motion, whether or not an attorney mentioned this law before the IJ. Ordinarily, the fact that the BIA ruled in the alternative that Sanchez's case did not merit relief as a matter of discretion would be enough to doom her petition independently. Here, however, there was a prior question that the BIA resolved incorrectly—whether Sanchez's attorney rendered ineffective assistance. We conclude, on this record, that he did. The record on which the BIA would have assessed its discretionary ruling would have been quite different had the lawyer performed adequately. We thus grant the petition for review and return this case to the BIA for a re-evaluation of the merits of Sanchez's motion.

**I**

Ana Sanchez entered the United States on August 1, 1989, "without inspection," as immigration specialists would say. With the exception of a brief trip to visit her

mother in Mexico in 1993, which was short enough not to amount to a legal interruption of her residency, she has remained in the United States ever since. In 1991, Sanchez married Francisco Mendez, a legal permanent resident. The couple had a daughter, Adanely Mendez, on December 23, 1991, but Mendez never petitioned to adjust Sanchez's status. Sanchez alleges that she suffered physical, emotional, and psychological abuse at Mendez's hands. Sanchez and Mendez divorced on May 26, 1995.

Five years later, in February 2000, Sanchez met Robert Bozynski, who was a manager at a car dealership at which Sanchez and her sister purchased a vehicle. After a number of calls from Bozynski, Sanchez agreed to go out with him for dinner. The two began dating, and Bozynski proposed marriage to Sanchez on several occasions. She declined initially. In February 2001, the two went out for dinner. Sanchez had two drinks over the course of the evening, but they had a powerful effect on her. She lost consciousness and woke up later in Bozynski's bed, with him on top of her. She had trouble opening her eyes and could not defend herself; later, she concluded that the drinks must have been drugged. When she tried to discuss this incident with Bozynski, he insisted that the sexual encounter was consensual.

A few weeks later, Sanchez went to Los Angeles with Adanely and her sister to visit her sick father. During that trip, she learned that she was pregnant. She informed Bozynski of this fact as soon as she returned to Chicago. He became upset and accused her of lying; he also accused her of cheating on him and having sex with another man. Nonetheless, the discovery of the pregnancy prompted Sanchez to agree to marry Bozynski; they were married right away, on April 13, 2001.

Problems with the marriage surfaced quickly. Right after the wedding, Sanchez, Bozynski, and Adanely took a trip

to North and South Carolina. During this time, Bozynski became rude and accusatory. He began to denigrate Sanchez because she was a Mexican immigrant; he became angry when she spoke Spanish to Adanely because he could not understand what she was saying; he demanded that she return the wedding ring; and he threatened to have her deported to Mexico by reporting her to the immigration authorities. She believed that he was angry because she was feeling ill as a result of the pregnancy and thus did not want to have sex during the trip, but she complied with his request to return the ring.

When they returned to the Chicago area, Sanchez and Adanely returned to their home in Maywood, Illinois, and Bozynski stayed at his home in Crystal Lake. Before the marriage, they had agreed that this would be their temporary arrangement, so that Adanely could finish the school semester before moving to Crystal Lake. Bozynski refused to provide medical coverage for Sanchez during her pregnancy, because he took the position that the baby was not his. Sanchez therefore applied for and received public assistance in her own name. At the time, Sanchez did have health insurance through her employer, but it was under an assumed name. On November 20, 2001, Valerie Sanchez was born; DNA testing later confirmed that Valerie is Bozynski's daughter.

Relations remained bad between Sanchez and Boyznksi. On April 22, 2002, Bozynski made good on his threat to report Sanchez to the Immigration and Naturalization Service. He told the INS that Sanchez "claimed to have requested the marriage for the sole purpose of obtaining lawful status in the United States. She informed the complainant [Bozynski] that since she was now married to him (a United States citizen) and pregnant with a child to be born in the United States, there was nothing anyone could do to remove her from the United States." Bozynski also told the INS that Sanchez was working

under an assumed name. The next day, April 23, 2002, Sanchez was arrested by the INS and served with a Notice to Appear ("NTA"); she was released the same day on her own recognizance. Bozynski and Sanchez were divorced effective January 16, 2003.

The NTA included four factual allegations:

1. You are not a citizen or national of the United States;

2. You are a native of Mexico and a citizen of Mexico;

3. You entered the United States at or near El Paso, Texas on August 01, 1989;

4. You were not then admitted or paroled after inspection by an Immigration Officer.

On the basis of those allegations, the INS charged that Sanchez was subject to removal pursuant to § 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(6)(A)(i).

On July 3, 2002, Sanchez attended an initial master calendar hearing, at which she was represented by Attorney Ralph M. Schelly. On her behalf, Attorney Schelly admitted the factual allegations in the initial NTA and notified the IJ that Sanchez was going to apply for cancellation of removal as a battered spouse. The IJ ordered the attorney to prepare the proper application and to obtain the records of any criminal convictions she had. The IJ scheduled another hearing for October 30, 2002. On July 5, 2002, the INS added two more allegations to the NTA: first, that Sanchez had been convicted of battery on August 4, 1995, in violation of 720 ILCS 5/12-3, and second, that she had been convicted of battery on December 21, 1994, in violation of the same statute. These two convictions, INS asserted, made her removable under § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I), which

covers inadmissibility for committing a crime of moral turpitude. Sanchez denied that she had committed such a crime. Later, on August 5, 2002, Sanchez was convicted in Illinois of possession of a fake identification card, for which she was sentenced to six months' court supervision and community service and had her driver's license suspended. It appears that these charges were not formally added to the NTA, but evidence of them was eventually introduced into the administrative record.

On July 11, 2002, Sanchez filed applications for cancellation of removal under both 8 U.S.C. § 1229b(b)(1) (covering ordinary cancellation) and § 1229b(b)(2) (covering VAWA cancellation). At the October 30, 2002, hearing, the IJ explained to Sanchez the difference between requesting cancellation generally and requesting cancellation under the VAWA rules. The general rules require continuous physical presence within the United States for 10 years, good moral character, lack of convictions of certain offenses, and a showing of exceptional and extremely unusual hardship to the U.S. citizen or permanent resident spouse, parent, or child. 8 U.S.C. § 1229b(b)(1). The VAWA rules are more lenient. They require (as applied to Sanchez's case) the applicant to establish that she was "battered or subjected to extreme cruelty" by a spouse or parent who is a U.S. citizen or lawful permanent resident, 8 U.S.C. § 1229b(b)(2)(A)(i), and that she had resided continuously in the United States for a period of three years, that she is a person of good moral character, and that her removal would result in extreme hardship to herself or her child. 8 U.S.C. § 1229b(b)(2)(A)(ii)-(iii). At the end of the October 30 hearing, the judge continued the proceedings to see if Sanchez could qualify for either type of cancellation.

Her hearing was not reconvened until August 19, 2004. At that time, Attorney Schelly first attempted to present documents relating to Adanely's treatment for scoliosis

at a local hospital, despite the fact that he had failed to comply with a local rule requiring 10 days' notice of this type of proffer. The IJ then asked whether Sanchez intended to pursue VAWA cancellation. Inexplicably, Schelly said no and indicated that she was going to apply only for ordinary cancellation. Schelly offered no reason why his client would voluntarily forgo the more lenient VAWA approach.

At the hearing, Sanchez testified about her presence in the United States and about Adanely's schooling and health (including her scoliosis). She gave a brief statement about her two battery arrests and convictions in 1994 and 1995 and admitted that she had been charged and convicted for possession of a false identification card. In response to questions from the IJ about her marriage to Bozynski, she explained that she married him because she was pregnant with his child. She also noted that she had gone to court to establish paternity. (The IJ found that Bozynski was Valerie's father.) Sanchez also testified that Bozynski had paid a detective to follow her for seven months, and that she was arrested when she went to work one day. She also explained that she had applied for public assistance while she was pregnant because she wanted to use her true name, and to have her true name appear on Valerie's birth certificate. (It was her insurance through her employer that reflected the pseudonym Maria Morato.) Through a proffer at the hearing, the attorney from the Department of Homeland Security (which by then had succeeded to the INS's responsibilities) presented Bozynski's testimony. Bozynski claimed that he had been duped about the marriage, that Sanchez lost interest in him immediately after it took place, that he had offered to pay for Valerie's birth expenses, and that he had witnessed Sanchez driving after she lost her license.

The IJ did not place significant weight on Bozynski's version of the events. He found that Sanchez had met the

"exceptional and extremely unusual hardship" standard and that there was no evidence that the marriage had been a sham. He also found that Sanchez was not removable as an alien convicted of a crime of moral turpitude, because she was convicted only of simple battery. Nonetheless, as a matter of discretion he denied Sanchez's application for ordinary cancellation and granted Sanchez 60 days in which to depart voluntarily. Attorney Schelly filed an appeal to the BIA from that order on Sanchez's behalf, but the Board affirmed the IJ's decision without opinion on September 20, 2005. Later, Schelly filed a petition for review with this court, but it was dismissed for lack of jurisdiction, based on 8 U.S.C. § 1252(a)(2)(B)(i), on January 11, 2006.

Since the 2004 hearing before the IJ, Sanchez has apparently turned her life around. She continues to reside with her two daughters in Maywood, she has had no more arrests or convictions, and she has a legitimate full-time job. Adanely continues to receive treatment for her scoliosis. She is a U.S. citizen; she has never been to Mexico and speaks very little Spanish. She visits her father regularly, and he has been paying child support to Sanchez. Unfortunately, in 2004 Adanely was the victim of unwanted sexual conduct by a 21-year-old male when she was visiting her father's house. Sanchez took steps to have the offender prosecuted, and he was convicted of aggravated criminal sexual abuse in September 2004. Although Valerie lives with her mother, the divorce decree awarded joint legal custody to Sanchez and Bozynski; the court order forbids Sanchez from removing Valerie from the United States. Bozynski has sought to obtain sole legal custody over her, based on Sanchez's immigration status. Both Adanely and Valerie suffer from anxiety. Sanchez is worse off: she has dysthymia and post-traumatic stress disorder. She has also received counseling at Sarah's Inn, a domestic violence agency,

since April 2002, and at Turning Point, another agency for survivors of domestic violence.

**II**

This petition comes to us, as we noted earlier, primarily from the BIA's decision of June 16, 2006, denying her motion to reopen her case. Sanchez filed her petition for review on June 26, 2006, within 30 days of that decision, which was docketed as case No. 06-2745. On August 16, 2006, the Board denied a motion to reconsider its June 16 order. Sanchez filed a petition for review from that decision on September 11, 2006; that case was docketed here under No. 06-3424. We focus here on the June 16 order, as the BIA's later order simply reaffirmed it.

In our view, this petition requires us to decide the following issues, in this order: (1) was Sanchez entitled to present her argument that her lawyer's performance was prejudicial and below the standards recognized by the Board itself in the motion to reopen; (2) if so, does substantial evidence support the BIA's evaluation of that argument; (3) was Sanchez prejudiced by the lawyer's waiver of her VAWA claim; and (4) must her petition be denied in any event because of the Board's statement that it was denying her motion to reopen in the alternative as an exercise of its discretion.

At the outset of these proceedings, Sanchez's attorney indicated that he was going to request both ordinary cancellation of removal and VAWA cancellation. At this point, however, at least one thing is clear: it is too late for Sanchez to file her motion to reopen insofar as she wishes to challenge the denial of ordinary cancellation under § 1229b(b)(1). The regulations require that a motion to reopen for this type of claim must be filed within 90 days of the Board's decision. See 8 C.F.R. § 1003.2(c)(2).

Because Sanchez's motion was filed long after that 90-day period elapsed, the BIA properly concluded that her motion was untimely. Sanchez made no argument for equitable tolling of that 90-day period, and thus we have no need to consider whether she might have qualified under that line of cases. See, *e.g.*, *Patel v. Gonzales*, 442 F.3d 1011, 1016-17 (7th Cir. 2006). Although the Board in its discretion might have decided to accept the late motion, we have no jurisdiction over any discretionary decision on its part not to do so. See *Pilch v. Ashcroft*, 353 F.3d 585, 586 (7th Cir. 2003); *Ali v. Gonzales*, 448 F.3d 515, 518 (2d Cir. 2006) (citing cases).

The more difficult question is whether the BIA properly concluded, in effect, that Sanchez had waived the right to seek VAWA cancellation when her attorney failed to pursue that relief at the hearing held on August 19, 2004. The BIA regarded this decision as a strategic one and thus as not a ground for reopening. It also noted that the relief that she was seeking in her motion was primarily based on alleged abuse by her ex-husband that occurred before August 2004, even though it acknowledged that she was also attempting to rely on events that post-dated that hearing.

It is important, at the outset, to recall the functions played by motions to reopen and motions to reconsider. We recently reviewed both of these devices:

> Motions to reopen and motions to reconsider serve distinct functions. . . . Motions to reopen ask the BIA to reconsider its earlier decision based on "facts or evidence not available at the time of the original decision," . . . ; they do not challenge the correctness of an earlier decision based on the existing record, . . . . By contrast, the basis of a motion to reconsider is a contention that "the original decision was defective in some regard." . . . Motions to recon-

> sider ask the BIA to reexamine its earlier decision "in light of additional legal arguments, a change of law, or an argument that was overlooked." . . . Therefore, in considering such motions, the Board places itself "back in time and consider[s] the case as though a decision in the case on the record before [it] had never been entered."

*Mungongo v. Gonzales*, 479 F.3d 531, 534 (7th Cir. 2007). In this case, Sanchez is attempting to introduce new evidence—that of her attorney's substandard and prejudicial performance—that was not available at the earlier hearing. An analogy to cases claiming ineffective assistance of counsel in the criminal context is useful: this court regularly reminds counsel that a direct appeal is not the right time to raise such a claim, because the record is almost always too sparse. Only with the new evidence that can be developed using a motion under 28 U.S.C. § 2255 can counsel's effectiveness properly be evaluated. We recognize that the substantive standard for assessing effectiveness of counsel is different in immigration cases, where it is derived from the immigration statutes and regulations and ultimately the Fifth Amendment's due process clause, than it is in criminal cases, where the Sixth Amendment applies. Nevertheless, the fact that new evidence is necessary is the same.

The BIA's consideration of Sanchez's assertion that counsel rendered ineffective assistance is what caused it to conclude that she had waived her VAWA claim. We therefore take up that topic first. In *Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988), the BIA both recognized that such a claim is possible in an immigration proceeding and described the materials that it would require to support this allegation. *Id.* at 638-39. Although the Board in *Lozada* said that the legal basis for a complaint about ineffectiveness of counsel rests ultimately in the Fifth Amendment's due process clause, *id.* at 638, we have

no need to decide where the constitutional boundaries for this kind of claim lie. It is enough that aliens have a statutory right to retain counsel, and that adequacy of representation is an important factor in assuring that the statutory right to a fundamentally fair proceeding is respected. See, *e.g.*, *Gjeci v. Gonzales*, 451 F.3d 416, 420-21 (7th Cir. 2006). The Board itself enforces the right to counsel in proceedings before it through, among other things, recognition that relief is possible when counsel is so deficient that the proceedings become fundamentally unfair. One recognized way in which this might occur is interference with the alien's statutory right to "a reasonable opportunity . . . to present evidence on [her] own behalf." 8 U.S.C. § 1229a(b)(4)(B). See also *Kerciku v. INS*, 314 F.3d 913, 917 (7th Cir. 2003). Sanchez's motion to reopen included everything the Board requires: (1) an affidavit from Sanchez setting forth the relevant facts, (2) a detailed description of her agreement with Attorney Schelly and describing the services he failed to provide, (3) proof that she informed Schelly of the allegations and gave him a chance to respond, and (4) proof that she filed a grievance with the Illinois Attorney Registration and Disciplinary Commission on March 3, 2006.

The central question we must therefore answer is whether the BIA's conclusion that Attorney Schelly's assistance was effective under the standards established in *Lozada* was supported by substantial evidence. The BIA admitted that it was not "clear from the record precisely why [the decision to forgo a request for VAWA relief] was made." It concluded, however, without any basis, that Schelly must have made a strategic decision to forgo this theory in favor of voluntary departure. But whatever else Schelly was thinking, the record shows that it could not have been that. At the end of the hear-

ing before the IJ, the following exchange took place between Schelly and the judge:

Judge: Mr. Shelly [sic], I assume you're going to reserve appeal for your client?

A: Yes.

Judge: We never really discussed Voluntary Departure on the record as an option here. So I granted it to the respondent, assuming you were seeking that as an alternative. Is that correct?

A: That is correct.

In other words, Schelly was happy to get voluntary departure for his client when the IJ offered it on a silver platter, but he certainly had done nothing to suggest that he had even thought of it, much less to indicate that he had made a strategic decision to abandon a promising ground of full relief in favor of this minor administrative advantage. There is simply no basis on which to support the Board's conclusion that Schelly was exercising any professional judgment at all when he abandoned the VAWA theory.

We also see no way to avoid the conclusion that this decision seriously prejudiced Sanchez. From her standpoint, the pursuit of VAWA cancellation could only have helped. The procedural requirements, as we have already noted, are significantly relaxed for this type of relief. The only extra substantive burden she would have undertaken would have been to prove the spousal abuse, which she was prepared to do and of which she proffered extensive evidence in her motion to reopen. (The government suggests that she might have been trying to keep the unfavorable evidence about her battery convictions and use of false identification out of the record, but it points to nothing in the law that would have justified exclud-

ing these materials, and indeed they were not excluded even though she did not raise the VAWA claim.) The IJ had signaled his willingness to entertain the VAWA motion, and there was no reason to think that the inclusion of a VAWA claim would have predisposed the judge against her. In fact, the IJ made a number of important findings in Sanchez's favor. He found "that [Sanchez's] convictions for battery do not constitute crimes involving moral turpitude and do not preclude [Sanchez's] eligibility for Cancellation of Removal under Section 240(A)(b) [sic]." AR at 862. He also listed a number of factors that cut in favor of Sanchez's claim, including her continuous residence in the United States, her current full-time employment, her support of her two U.S.-citizen children, and Adanely's medical needs. AR at 863-65. The IJ was concerned, however, that Sanchez had not presented any affidavits from her current employer or evidence from her relatives. Notably, Sanchez's sister and brother-in-law were present at the hearing, but for unexplained reasons Schelly did not call them to testify. Schelly also failed to collect Adanely's school records and thus was unable to produce them when the judge asked for them.

On the negative side, the judge reviewed Sanchez's two battery convictions and her conviction for possession of false identification documents. He was concerned that after the latter offense, she was caught driving without a license. She admitted that she had done so because she needed to get to work. The judge also weighed against her the fact that she applied for public assistance under her own name when she was pregnant with Valerie, instead of using the insurance she had with her employer under an alias. Last, the judge thought that she had not filed income tax returns, because she did not present any returns at the hearing.

Unbeknownst to the IJ, Sanchez in fact had filed her income tax returns and had furnished them to Schelly. See AR at 571-621. Schelly just failed to introduce them into the record. The IJ did not note, probably because Schelly did not point out, the fact that removal would require Sanchez to abandon Valerie as a result of the divorce decree. Had Schelly been pursuing VAWA relief, it is likely that this fact would have been at the forefront of the proceedings instead of lost. Nor did the IJ have before him all the evidence of domestic abuse that was later gathered, including sworn affidavits, letters from the two shelters, police reports, and the psychological evaluation. Bozynski, for example, became upset on the honeymoon trip when Sanchez refused his sexual advances in front of Adanely. He spurned Valerie until the court-ordered DNA tests proved that she was his, just as Sanchez had said. There was evidence showing that Valerie fears her father, and that he hit her with a shoe when she wet the bed.

We do not know whether, with all the facts properly before him and the backdrop of VAWA cancellation as the legal basis of the claim, the IJ would once again weigh all the evidence and conclude that Sanchez does not merit cancellation as a matter of discretion, or if, in the light of a proper record, he might weigh all the evidence and come to the conclusion that she does merit VAWA cancellation. All we can say is that the attorney's performance here was so deficient that Sanchez did not have the fair hearing to which the immigration statutes entitle her.

By the same token, the BIA's decision that it would deny the motion to reopen in the exercise of its discretion necessarily rests on the flawed record that was prepared before the IJ. The BIA, for example, shared the erroneous perception that Sanchez had failed to file tax returns for a 10-year period. It gave no weight at all to the substantial abuse that Sanchez and her two U.S.-citizen

daughters have suffered, nor did it display any concern about the possibility that the daughters would have to be turned over to the alleged abusive parent if Sanchez's removal was not cancelled. It is not our role to tell the BIA how it is supposed to weigh these factors. But, having found that counsel was ineffective for abandoning the VAWA theory for no explicable reason, and that the record before the IJ (and thus the record that went to the BIA) was woefully incomplete, we conclude that further proceedings are necessary so that the proper authorities can evaluate the legal claims and exercise their discretion on the basis of a presentation that is fair to the alien.

For these reasons, we GRANT the petition for review and return this case to the BIA for further proceedings.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*