# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-3391

PRINCE HENRY EKE,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A97-322-428.

ARGUED MAY 29, 2007—DECIDED JANUARY 7, 2008

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* Facing expedited removal from
the United States as an alien convicted of committing
an aggravated felony, Prince Henry Eke filed this petition
for review from the decision of the Board of Immigration
Appeals ("BIA" or Board) rejecting his request for with-
holding of removal. Initially, the Board argued before
this court that we lacked jurisdiction to consider Eke's
arguments. After oral argument, however, the Attorney
General withdrew that argument and, with the court's
permission, filed a supplemental brief defending the
Board's decision on the merits. Eke filed a response to

that brief on November 28, 2007, and so the case is now ready for decision.

Eke claims that if he is returned to his native Nigeria, it is more likely than not that he will be harmed seriously or even killed, because he is homosexual. The Board rejected this assertion, relying primarily on adverse credibility determinations; it found that Eke was subject to summary removal based on his guilty pleas to three crimes of theft of financial identity. Before this court, Eke now presents four reasons in support of his petition: (1) his convictions were not for crimes that fall within the definition of "aggravated felony" under 8 U.S.C. § 1101(a)(43)(M)(i); (2) he should not have been required to provide corroborating evidence of his homosexuality; (3) the Board should have considered the pattern of persecution against homosexuals in Nigeria; and (4) Eke's due process rights were violated when the Immigration Judge ("IJ") insisted on conducting the hearing on the merits by video conference. We conclude that the government correctly conceded that we have jurisdiction over the petition, but that Eke's claims fail on their merits. We therefore deny his petition for review.

# I

Eke is a 40-year-old native of Nigeria and member of the Ibo tribe. He claims to be a homosexual. Eke reported that he had a long-term sexual relationship with a male companion, Gozie, in Nigeria. Even though he tried to keep his sexual orientation a secret, Eke claimed that others in his community saw through his efforts, and he was, as a result, frequently harassed. According to Eke, his community's traditional law forbids homosexuality and regards it as punishable by death. After Eke's father was named king of his village, Eke allegedly became a prince and thus was responsible for certain cere-

monial duties. Bowing to pressure from his family, he at that time married a childhood friend, Rose Mary, and accepted her two children as his own. The record indicates that these children, in fact, were his own. The IJ noted that Eke's testimony on this point shifted over time. On direct examination, he admitted that he had fathered the children but initially had disclaimed paternity "because he did not want (them) and thought it was incredible that he had children. However, on cross examination, [Eke] testified that he never consummated the marriage and that he did not have any physical relationship with Rose Mary. Later during his cross examination," Eke "testified further that he did in fact have sexual relations with Rose Mary, on at least two occasions, and that he did have two children with her." Eventually, the marriage failed, after Rose Mary discovered Eke and his lover Gozie *in flagrante delicto*. At that point, Eke was forced to flee his village. He took refuge in an isolated village for three years, until he obtained the documentation needed to come to the United States, which he believed would be more accepting of his sexual orientation. Once in the United States, he lived briefly with his sister, but, he testified, she asked him to leave because of his gay lifestyle. This rejection prompted him to divorce his Nigerian wife and to marry an American woman. The latter wife also discovered that he was gay and ended the relationship.

In 2004, Eke made the mistake of trying to help a friend buy a used car with false documentation. He presented another person's social security card, a permanent residence card, an Illinois driver's license, and a state ID card, in an effort to purchase an automobile worth more than $10,000. Caught in the act, Eke pleaded guilty to conspiring to violate the Illinois identity theft statute, 720 ILCS 5/16G-15(a), and to two substantive counts of identity theft. On April 27, 2005, the Department of

Homeland Security ("DHS") served Eke with a Notice of Intent To Issue a Final Administrative Removal Order, based on those convictions. Although at one point Eke claimed that he never received this Notice, the government has now furnished a copy of it, and the copy shows clearly that Eke acknowledged service. More than that, the copy shows that Eke, by checking some boxes on the form, admitted the allegations in the Notice, admitted that he was deportable, waived his right to contest the charges, and designated Nigeria as the country to which he would be removed. Notwithstanding these representations, Eke then expressed a fear of persecution upon removal to Nigeria. DHS responded by putting Eke in proceedings for withholding of removal. An asylum officer found that Eke's fear was reasonable, but the IJ rejected his petition after a full hearing. The BIA agreed with the IJ, and Eke now presents his petition for review.

## II

Although the government has now withdrawn its challenge to this court's jurisdiction, we have a duty independent of its concession to assure ourselves that jurisdiction is secure. We therefore begin by explaining why we too have concluded that we have jurisdiction over this petition.

This case arose under the provisions of the Immigration and Nationality Act ("INA") that authorize expedited removal of certain aliens who have been convicted of committing aggravated felonies. See INA § 238(b), 8 U.S.C. § 1228(b). Critically, section 238(b) allows a final removal order to issue without a hearing for the alien. Expedited removal begins with formal notice served on the alien. See 8 U.S.C. § 1228(b)(4) ("The Attorney General shall provide that . . . the alien is given reasonable notice of the

charges and of the opportunity [to inspect the evidence and rebut the charges].”); 8 C.F.R. § 238.1 (“Removal proceedings . . . *shall commence* upon personal service of the Notice of Intent upon the alien . . . .”) (emphasis added).

As we noted, DHS served Eke with a Notice of Intent To Issue a Final Administrative Removal Order on April 27, 2005. The Notice provided, consistently with 8 C.F.R. § 238(b)(2)(i), that Eke had 10 calendar days in which to respond to the charges. For an alien who does not file a response, the regulations provide that DHS may follow up with a Final Administrative Removal Order. 8 C.F.R. § 238.1(d). Eke’s Notice informed him that he would be entitled to “seek judicial review of any final administrative order by filing a petition for review within 14 calendar days after the date such final administrative order is issued.” DHS in fact issued its Final Order in Eke’s case on May 5, 2005. Although Eke did not seek independent judicial review of that determination, what happened next was that DHS referred him for a credible-fear interview, based on his statement that he believed that he would be killed or injured upon his return to Nigeria because of his sexual orientation. An Asylum Officer from DHS’s Citizenship and Immigration Services office interviewed him on June 2 and 30, 2005, and determined that Eke had demonstrated a reasonable fear of persecution. His case was then referred to the Immigration Court on July 19, 2005, for consideration of his petition for withholding of removal.

An IJ held a hearing on July 26, 2005, at which he considered Eke’s eligibility for both withholding of removal and relief under the Convention Against Torture. With respect to the former, the IJ noted that Eke had the burden of demonstrating a clear probability of persecution in Nigeria on account of his race, religion, nationality, membership in a particular social group, or political

opinion. See *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). In a written decision dated May 23, 2006, the IJ found that Eke failed to meet that burden. The record, the IJ thought, was riddled with inconsistencies going to the heart of Eke's claims; at one point Eke fraudulently entered into a marriage in order to obtain a benefit under the immigration laws; and Eke never sought asylum until after he had committed the aggravated felony. Eke's testimony was not even clear on such a major point as how and why his son was killed at the hands of the village elders. The IJ also found that Eke's commission of the crimes of identity theft independently barred him from withholding of removal, as those crimes were particularly serious, that Eke had not shown a clear probability of future persecution based on his sexual orientation, and that he had failed to show that the threat of persecution he faced existed throughout the country. On the last point, the IJ noted that Eke's claim that he could not relocate was not objectively reasonable, in light of the fact that he had remained in Nigeria for three years in a different village without apparent difficulty. The BIA affirmed the IJ's decision and denied Eke's motion to remand the matter to the IJ in a decision dated August 31, 2006.

Eke filed a timely petition for review from the BIA's order. We are satisfied that the Attorney General is correct that the immigration authorities were not finished with Eke's case until the BIA's final decision, and thus we are authorized to consider the question whether DHS correctly determined that Eke's state court convictions were "aggravated felonies" for purposes of the immigration laws. The Real ID Act, 8 U.S.C. § 1252(a)(1)(D), put an end to any doubt on the matter. Moreover, even before that, we had explained that "we retain jurisdiction to determine whether we have jurisdiction—that is, to determine whether an alien's criminal conviction is

indeed an 'aggravated felony' under the INA, thereby triggering the jurisdictional bar of § 1252(a)(2)(C)." *Lara-Ruiz v. INS*, 241 F.3d 934, 938-39 (7th Cir. 2001).

Even though we lack jurisdiction to review the Attorney General's exercise of discretion to grant or deny relief to an alien, we have the authority to decide constitutional claims and questions of law. See 8 U.S.C. § 1252(a)(1)(D); *Ali v. Achim*, 468 F.3d 462, 465 (7th Cir. 2006). Our review of the determination that Eke committed an aggravated felony is *de novo. Lara-Ruiz*, 241 F.3d at 938-39. Our review of the legal standards that the IJ and BIA applied is also *de novo. Gattem v. Gonzales*, 412 F.3d 758, 763 (7th Cir. 2005).

## III

On the merits, the government argues first that Eke conceded that he was deportable for having been convicted of an aggravated felony, and that should be the end of it. Eke responds that the Notice presented to him did not indicate that he could contest the characterization of his offenses, and thus that he should not be found to have waived an argument that he never knew he had. Moreover, Eke points out, the government did not make its own waiver argument in its initial brief in this case, and thus we should find that it has forfeited its waiver argument. Given the shifts in position that have occurred in this case, we prefer not to resolve it on waiver grounds, either way. We are satisfied that Eke has been trying to raise the argument that his convictions, for various reasons, should not automatically lead to his removal. Both sides have now briefed the merits of this point, and so we see no reason not to reach them.

Eke contends that he was not convicted of an "aggravated felony," as defined by 8 U.S.C. § 1101(a)(43), because

there is an incomplete overlap between the Illinois law identity theft statute under which he was convicted, which encompasses cases where a criminal has obtained $10,000 or more in "credit, money, goods, services, or other property," and the relevant INA section, which requires "a loss to the victim or victims [that] exceeds $10,000." See 720 ILCS 5/16G-15; 8 U.S.C. § 1101(a)(43)(M)(i).

To determine whether any of Eke's convictions amounts to a conviction for an "aggravated felony," we follow the "categorical approach." *Hashish v. Gonzales*, 442 F.3d 572, 575-76 (7th Cir. 2006). The Ninth Circuit did the same in a case very similar to the one now before us:

> We first make a categorical comparison between the generic crime—here, an "aggravated felony," defined as an offense that "involves fraud or deceit in which the loss to the victim or victims exceeds $10,000," 8 U.S.C. § 1101(a)(43)(M)(i)—and the elements of each particular offense of which Petitioner was convicted. If the statutory crime of conviction is broader than the generic crime (that is, if Petitioner could have been convicted under the statute for conduct that would not satisfy the generic crime) then we must move to the 'modified categorical approach':

> Under the modified categorical approach, we conduct a limited examination of documents in the record of conviction to determine if there is sufficient evidence to conclude that a defendant was convicted of the elements of the generically defined crime even though his or her statute of conviction was facially overinclusive.

*Li v. Ashcroft*, 389 F.3d 892, 895-96 (9th Cir. 2004) (internal citations and quotation marks omitted). Other circuits employ the same analysis. For example, the First Circuit observed in *Conteh v. Gonzales*, 461 F.3d 45 (1st Cir. 2006), that

> [t]he INA does not prescribe a detailed methodology for determining whether a predicate offense fits within these definitions (and, thus, qualifies as an aggravated felony). Where uncertainty exists, however, virtually every court of appeals faced with the question has sought some form of guidance from the categorical approach devised by the Supreme Court for use in the criminal sentencing context. The BIA has followed suit, citing the leading Supreme Court precedent, *Taylor v. United States*, 495 U.S. 575 (1990), in a number of aggravated felony decisions.

461 F.3d at 52 (citations omitted).

The INA includes many offenses within its definition of "aggravated felony," but only one is relevant to Eke's case: "an offense that—(i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000 . . . ." INA § 101(a)(43)(M)(i); 8 U.S.C. § 1101(a)(43)(M)(i). We must therefore determine whether Eke's Illinois convictions met these criteria, by looking at the "terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Shepard v. United States*, 544 U.S. 13, 26 (2005). Two elements stand out: first, did the offense involve fraud or deceit; and second, was "the loss to the victim or victims" more than $10,000. Although at one point, Eke had argued that his conspiracy conviction did not involve an amount over $10,000, he has now withdrawn that argument. We thus analyze all three convictions together.

The relevant Illinois statute bars using another person's identity information "to fraudulently obtain credit, money, goods, services, or other property." 720 ILCS 5/16G-15(a). The record here includes an indictment

from the Grand Jury in Cook County, Illinois, charging that Eke violated this statute when he

> knowingly used any identification document, to wit: social security card and naturization [*sic*] permanent residency card of another person, Peace Ralston[,] to fraudulently obtain credit, money, goods, services, or other property, to wit: an automobile in the name of Peace Ralston and the value of the credit, money, goods, services, other property exceeded ten thousand dollars but did not exceed one hundred thousand dollars . . . .

Another count of the indictment alleged a violation of 5/16G-15(a) with the use of "Illinios [*sic*] driver's lecense [*sic*] and Illinois state ID of another person, Peace Ralston." Finally, the third count of the indictment charged Eke with conspiracy to commit a financial crime, in violation of 720 ILCS 5/16H-45, in that he "had personal information of Peace Ralston mailed to his post office box on two occasions in furtherance of that agreement with Sabina Olapindo and presented said documents of Peace Ralston to purchase an automobile as part of a common scheme . . . ." There is also a "Certified Statement of Conviction/Disposition," which lists the three charges as follows:

> 720-5/16G-15(a) . . . F . . . . FIN ID THEFT $10,000<$100,000
>
> 720-5/16G-15(a) . . . F . . . . FIN ID THEFT $10,000<$100,000
>
> 720-5/16H-45 . . . . . F. . . .  FIN CRIME/CONSPIRACY/>10K-100K

Eke argues that these convictions punish frauds in which the value of the credit or item exceeded $10,000, but that the aggravated felony that DHS identified focuses on a loss to the victim that exceeds $10,000. Here, Eke continues, he never actually "obtain[ed] credit, money, goods, services, or other property" through his

*attempted* use of Ralston's identity. At most, he attempted to obtain credit and goods through the use of Ralston's documents, but his efforts were unsuccessful. (As we read his arguments, Eke concedes that the Illinois convictions involved fraud or deceit, and so we focus only on the monetary element.)

The government agrees that a categorical approach is proper, citing *Taylor v. United States*, 495 U.S. 575, 602 (1990), as modified by *Shepard v. United States*, 544 U.S. 13, 26 (2005), and as applied to immigration cases in *Espinoza-Franco v. Ashcroft*, 394 F.3d 461, 465 (7th Cir. 2006), superceded by statute on other grounds, as stated in *Hamid v. Gonzales*, 417 F.3d 642, 647 (7th Cir. 2005). Relying on INA § 101(a)(43)(U), which includes in the definition of "aggravated felonies" covered by the Act "an attempt or conspiracy to commit an offense described in this paragraph," the government argues that Eke's Illinois convictions fall within the Act's definition. Even though Illinois was not prosecuting Eke for attempted identity theft, it did prosecute him for conspiracy, and so § 101(a)(43)(U) is directly implicated. The documents we are entitled to consult show that he conspired to obtain more than $10,000 in valuable goods or services through his fraudulent acts; they also support a showing that he attempted to commit the felony identified by subsection (M).

Eke's conviction for conspiracy is enough by itself to justify our looking to the full amount of the loss Eke intended to inflict. We therefore need not decide whether § 101(a)(43)(M), standing alone, refers only to actual loss or to intended loss. Over the objection of one member of the panel, the Ninth Circuit suggested in dicta that subsection (M) in isolation does not include intended loss. See *Kharana v. Gonzales*, 487 F.3d 1280, 1282 n.3 (9th Cir. 2007). But see *id.* at 1286 (Wallace, J., concurring). For what it is worth, we think that Judge Wallace, who

argued that intended loss could be considered for subsection (M), had the better of the exchange. The definition of the term "aggravated felony" appears in § 101(a)(43) as a whole; each of that section's subparts contributes to the definition, including subpart (U), which adds to everything that went before "an attempt or conspiracy to commit an offense described in this paragraph." In general, courts should give effect to all parts of the statute. Furthermore, reading subsection (M) to include intended loss is consistent with the way that loss is defined for purposes of the sentencing guidelines. This court has held that the guidelines call for the use of intended loss in fraud cases, where intended loss is greater than actual loss. *United States v. Saunders*, 129 F.3d 925, 932 (7th Cir. 1997). Indeed, an unused line of credit is generally viewed as an intended loss. See, *e.g.*, *United States v. Mei*, 315 F.3d 788, 792 (7th Cir. 1993) ("[I]n determining an intended loss courts focus on the amount that the scheme placed at risk, not the amount of money or property stolen."); *United States v. Lin*, 410 F.3d 1187, 1191-93 (10th Cir. 2005) (estimating intended loss in credit card fraud by aggregating the limits on the unused credit cards); *United States v. Sowels*, 998 F.2d 249, 251 (5th Cir. 1993) (calculating loss from credit card fraud as the aggregated credit limits of the cards).

The charging documents and the record of conviction show that Eke pleaded guilty to using and to conspiring to use someone else's identifying information to obtain "credit, money, goods, services, or other property" in an amount exceeding $10,000. We therefore hold that the Attorney General relied on a permissible conviction for purposes of the Final Administrative Removal Order.

**IV**

A

Eke also claims that the BIA should have granted his petition for withholding of removal. Both the IJ and the BIA erred, he claims, by requiring him to corroborate his claim of persecution based on his membership in the social group of homosexual men. The Real ID Act changed the landscape for our review of this type of claim. See Real ID Act of 2005 § 101(e), Pub. L. No. 109-13, 119 Stat. 231 (May 11, 2005). Under the amended statute, "[n]o court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." INA § 242(b)(4), 8 U.S.C. § 1252(b)(4).

The IJ concluded that Eke did not present credible testimony, noting that his testimony lacked "sufficient detail and . . . failed to logically explain away the myriad of inconsistencies and clearly contradictory statements present throughout his entire testimony, affidavit, and Credible Fear interviews." The IJ then added that "[s]pecific, detailed, and credible testimony or a combination of detailed testimony and corroborative background evidence is necessary to prove a case," but that "[h]ere the respondent has failed to provide both." There is nothing in the nature of Eke's claims that would compel us to find that corroborating evidence was unavailable to him. The BIA's comments on the lack of corroborating evidence are telling:

> The applicant did not provide any supporting witnesses. . . . He also failed to either submit some kind of documentation indicating his sexual preferences, such as letters, affidavits, photographs, or other forms of corroborative evidence; or establish that

such evidence was not reasonably available to him. In fact, the applicant could not even provide the name of the gentleman with whom he was allegedly involved in a homosexual relationship.

The BIA's description shows that many different kinds of materials might have served as corroborating evidence; it was Eke's failure to present anything useful, combined with the gaps and inconsistencies in his various accounts of his story, that undermined his case in the IJ's eyes.

## B

Eke also argues that the BIA committed legal error when it considered the issue of future persecution. Under the relevant regulation, 8 C.F.R. § 208.16(b)(2)(i) and (ii), an alien does not have

to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and identification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.

8 C.F.R. § 208.16(b)(2). Eke claims that he has satisfied these two requirements, but that the IJ (ratified by the BIA) erroneously required him to show that he "would be singled out individually" for persecution.

We do not read the IJ's opinion that way. The IJ acknowledged that Eke had shown evidence of a pattern of

persecution against the social group of homosexuals, specifically noting "[t]he U.S. Department of State *Country Reports* and supporting material submitted by the respondent generally describe the social conditions and situation for homosexuals in Nigerian society." The problem was that the IJ did not credit Eke's testimony that he, individually, was part of this persecuted group. It was Eke's burden to "establish[] his or her own inclusion and identification with such group of persons . . . ." 8 C.F.R. § 208.16(b)(2)(ii). Although it would have been helpful had the IJ stated explicitly that its finding that Eke was not credible meant that it could not conclude that Eke is a homosexual, such that it was more likely than not that a return to Nigeria would threaten Eke's life or freedom, this degree of precision was not essential. Eke's testimony and affidavit contained several inconsistencies about his homosexuality and history of homosexual conduct. Because of these inconsistencies and the IJ's credibility finding (which we cannot disturb on these facts), Eke failed to show his inclusion in the social group of "homosexuals." Thus, the IJ was not required to consider further his argument under 8 C.F.R. § 208.16(b)(2).

C

Finally, Eke claims that the government violated his due process rights by conducting his hearing by tele-video rather than in person. Eke contends that if the IJ had seen him in person, the IJ would have recognized that Eke is in fact homosexual.

We note at the outset that the statute governing Eke's hearing, 8 U.S.C. § 1229a, specifically authorizes proceeding by means of a video conference. See 8 U.S.C. § 1229a(b)(2)(A)(iii). Eke claims that this part of the statute, which is implemented by 8 C.F.R. § 1003.25(c),

violates his constitutional due process rights. No court has ever so held, however. Indeed, the Fourth Circuit rejected a due process argument in similar circumstances. *Rusu v. INS*, 296 F.3d 316, 324 (4th Cir. 2002). In *Rusu*, the three-hour hearing "was plagued by communication problems." *Id.* at 319. The petitioner's "damaged mouth and missing teeth [made him] . . . unable to speak clearly." *Id.* Yet even though the IJ had difficulty comprehending the petitioner's testimony, the court reporter had to write "indiscernible" a total of 132 times on the transcript of the hearing, and the petitioner had difficulty comprehending the questions of his counsel, and even though there were technological problems with the video conference equipment, the Fourth Circuit found no due process violation because "the IJ concluded that she could glean the asserted factual basis of Rusu's Application." *Id.* (No such technical difficulties occurred in this case.) The *Rusu* court relied on the Supreme Court's decision in *Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976), which "recognized that 'the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner' . . . [but that] will have different meanings in different circumstances, and due process only 'calls for such procedural protections as the particular situation demands.'" *Rusu*, 296 F.3d at 321; see also *Hermez v. Gonzales*, 227 Fed. Appx. 441, 445 (6th Cir. 2007) (nonprecedential).

We agree with the Fourth Circuit that *Eldridge* should guide our analysis here. An alien in removal proceedings is not entitled to all of the protections that a criminal defendant would receive, even though at a broad level of generality both are entitled to due process. As for Eke, even if we thought (stereotypically) that something about his physical presence could prove his homosexuality, he has not explained how the tele-video format prevented the IJ from considering that evidence. Thus, Eke

has failed to show prejudice, which is required for him to succeed on this claim. *Capric v. Ashcroft*, 355 F.3d 1075, 1087-88 (7th Cir. 2004).

## V

We conclude, in summary, that the Illinois convictions on which the government relied in Eke's removal proceeding were properly characterized as aggravated felonies, and that Eke's other challenges to his petition for withholding of removal are without merit. We therefore DENY his petition for review.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*