In the

# United States Court of Appeals
## For the Seventh Circuit

————————

No. 07-2405

OUMAR SOUMARE,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY,
Attorney General of the United States,

*Respondent.*

————————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A97-119-672

————————

ARGUED FEBRUARY 26, 2008—DECIDED MAY 8, 2008

————————

Before KANNE, SYKES, and TINDER, *Circuit Judges*.

KANNE, *Circuit Judge*. Oumar Soumare, a native and citizen of Guinea, petitions for review of a final order of removal issued by an Immigration Judge (IJ) and affirmed by the Board of Immigration Appeals (BIA). The IJ denied Soumare's application for asylum and withholding of removal after determining that Soumare had not met his burden of proof through credible testimony or corroborating evidence. Because the record supports the IJ's adverse credibility determination and his decision to require corroboration, we deny Soumare's petition.

## I. HISTORY

Soumare entered the United States in March 2003 at Miami, Florida. In July 2003, Soumare, who was not yet in immigration proceedings, filed an application for asylum and withholding of removal based on his political opinion. In this first application, Soumare stated that in 1998 he was "harmed and mistreated" by members of the Guinean ruling party because of his political activities. Specifically, Soumare claimed that he and his family had been "arrested[,] interrogated, convicted and sentenced" for financing rebels, though they had not had done so.

In response to the application, an asylum officer interviewed Soumare, *see* 8 C.F.R. § 1208.9, and after determining that Soumare was inadmissible, referred his application to the Executive Office of Immigration Review, *see id.* § 1208.14(c)(1). As a result, Soumare received a notice to appear in September 2003, *see id.* § 1208.19, which initiated removal proceedings against him because he was present in the United States without being admitted or paroled, *see* 8 U.S.C. § 1182(a)(6)(A)(i).

During his immigration proceedings, Soumare conceded that he was removable as charged in the notice to appear, and in May 2004, Soumare, with the assistance of his attorney, filed a new application for asylum and withholding of removal. In this second application, Soumare claimed eligibility for asylum based on his political opinion, nationality, and membership in the Rally for the Guinean People ("RPG"), the main democratic opposition political party in Guinea. Soumare's application did not identify RPG by its full name; rather, he identified it only by the initials, "RPG."

Soumare appended to his second asylum application a type-written statement that elaborated the alleged

mistreatment he suffered at the hands of the ruling Guinean authorities. The statement alleged that (1) in 1996, supporters of the ruling party "looted and destroyed" Soumare's father's stores; (2) in 1998, his brother, who managed the family businesses, was taken from the family home and then detained, interrogated, and beaten for one month, on the suspicion that the family financed rebels with proceeds from their businesses—his brother then fled to Senegal; (3) soon after the incident with his brother, government officials arrested Soumare in the middle of the night, and he too was detained, interrogated, and beaten for one week thereafter; and (4) in November 2001, Soumare was again arrested for supporting RPG, and he was held until February 2003—during this fifteen-month span Soumare was "severely beaten and tortured" in prison in Conakry. Soumare did not submit any other supporting documents with his asylum applications.

In early December 2004, Soumare testified (through an interpreter) before the IJ. At the outset, Soumare attested that his asylum applications were complete and accurate, and he and his counsel declined the IJ's invitation to correct or supplement the applications. Soumare then testified about his asylum claim. He stated that he feared returning to Guinea because he and his entire family, including his father and brothers, were members of RPG. Soumare claimed that he attempted to recruit members for RPG on nights and weekends from 1995 to 2001, and in exchange, RPG promised him a "good position" in their new government once they took power. Soumare could not state how many hours he spent recruiting for RPG, or how many people he was able to recruit to the party. When asked by the IJ what RPG stood for, Soumare

could not state the party's name—he first uncertainly called it the "Assembly or Reassembly, Popular of Guinea," then stated it was the "Assembly of the People of Guinea."

Soumare also testified about the alleged persecution that he and his family suffered as a result of their participation in RPG. Soumare explained that his family's businesses were looted and vandalized by government officials. But in his hearing testimony, Soumare initially claimed that the stores were vandalized in 1998, not in 1996 as he had written in his application. Soumare testified that he took over managing his father's businesses after his brother fled to Senegal in 1998, and Soumare stated that he closed the stores in 1998 to avoid further accusations that the profits were being used to finance rebels. The IJ attempted to clarify when the stores were looted by asking Soumare whether he was managing the stores when the looting occurred. However, this colloquy did not produce a coherent answer.

Soumare's testimony deviated from his written asylum applications in other respects. Despite Soumare's statement in his first asylum application that he had been "harmed and mistreated" because of his membership in RPG in 1998, and despite the statement in his second asylum application that he had been arrested, detained for one week, and beaten in 1998, Soumare testified at his hearing that only his brother was arrested in 1998; he stated that the government did not bother him until he was arrested in November 2001. Soumare reiterated, in response to several questions at his hearing, that he was arrested only once, on November 3, 2001, for allegedly financing rebels. When asked on cross-examination about the inconsistency between his hearing testimony and his asylum applications, Soumare did not

stand by the written statements in his applications; rather, he stated that his applications must have been incorrectly transcribed where they indicated that he had been mistreated, arrested, and tortured in 1998. On cross-examination, the government also asked Soumare about the claim in his first asylum application that he and his family had been "arrested, interrogated, convicted, and sentenced" for financing rebels. In response, Soumare testified he was never convicted and that he "never went to court." He testified that he was never formally charged and never went before a judge.

During Soumare's testimony, Soumare's counsel tried to introduce an RPG membership card into evidence to corroborate Soumare's story. Soumare had not provided the card to his counsel until the date of the hearing. Consequently, the card had not been filed ten days prior to the hearing as required by the immigration court's local operating rules. *See Sanchez v. Keisler*, 505 F.3d 641, 645 (7th Cir. 2007). The IJ noted that the card had not been timely filed, *see* 8 C.F.R. § 1003.31(c), that the card had not been properly served upon the government prior to the hearing, *see id.* § 1003.32(a), and that the card was not in English and had not been translated by a certified translator, *see id.* § 1003.33. Because of these deficiencies, the IJ would not admit the card into the record. However, the IJ allowed Soumare to testify about the card.

After considering Soumare's testimony and asylum applications, as well as country reports on Guinea submitted by the government, the IJ issued a written decision in September 2005. The IJ noted that Soumare's hearing testimony was not "particularly specific or detailed." The IJ then acknowledged that Soumare ratified his asylum

applications at the outset of his hearing, and "at least two significant discrepancies became apparent." First, Soumare testified to only one instance of physical mistreatment, in 2001, despite claiming in both of his asylum applications that he had also been mistreated in 1998; the IJ rejected Soumare's explanation that the applications had been improperly transcribed because Soumare's second asylum application was prepared with the assistance of his attorney, and "[n]o corrections were made at the outset or during the hearing." Second, Soumare testified that he had never been convicted—or even appeared in court—though his first asylum application stated that he and his family had been convicted for financing rebels. Soumare never explained this disparity between his hearing testimony and his asylum applications. The IJ noted that these inconsistencies were "significant inasmuch as they are directed towards the heart of his claim . . . . Moreover, they do not assert new facts, rather quite the opposite (e.g. they are retractions of statements made in his application)."

The IJ concluded that, because of the inconsistencies, Soumare had not met his burden of proof through credible testimony. After expressly making this finding, the IJ stated that it would be reasonable to require corroboration from Soumare. The IJ found that Soumare had not corroborated his claim, nor had Soumare explained the absence of some form of corroboration, such as documentation relating to his family businesses. The IJ explained that Soumare's unauthenticated and untranslated RPG card, even if admitted into evidence, "would not corroborate the primary aspects of his claim, nor does the record support the conclusion that he reasonably fears persecution solely by virtue of his RPG member-

ship." Consequently, the IJ denied Soumare's applications for asylum and withholding of removal because Soumare had failed to advance a credible claim for asylum, and the IJ ordered Soumare removed to Guinea. In May 2007, the BIA affirmed the IJ's decision without issuing an opinion. Soumare timely filed his petition for review with this court in June 2007.[1]

## II. ANALYSIS

In his petition for review, Soumare challenges the IJ's determination that he did not testify consistently and credibly. Soumare also contends that the IJ improperly required him to present corroborative evidence to support his testimony. Soumare claims that his uncorroborated testimony was sufficient to establish a well-founded fear of persecution if he returns to Guinea, based upon his past experience.

Because the BIA summarily affirmed without an opinion, we review the IJ's factual findings and analysis for

---

[1] On the same day Soumare filed his petition for review with this court, Soumare's counsel also filed a motion to reconsider his claim with the BIA. Soumare's motion to reconsider raised the same objections to the IJ decision as Soumare does here. In July 2007, we granted a motion by the Government to hold this case in abeyance until the BIA decided Soumare's motion to reconsider. The BIA rejected Soumare's motion to reconsider in August 2007. Soumare never filed a new petition for review of his motion to reconsider, and never argued that motion in his brief or at oral argument in this case. Therefore, only the BIA's affirmance of the original IJ decision is before this court.

substantial evidence. *Haxhiu v. Mukasey*, 519 F.3d 685, 690 (7th Cir. 2008); *Sina v. Gonzales*, 476 F.3d 459, 461 (7th Cir. 2007). With respect to an IJ's credibility determination, we perform a highly deferential review, "in which we 'look for substantial evidence' and 'specific, cogent reasons that bear a legitimate nexus to the IJ's finding.' " *Sina*, 476 F.3d at 461 (quoting *Doumbia v. Gonzales*, 472 F.3d 957, 963 (7th Cir. 2007)). Given the high level of deference, " '[w]e will not overturn adverse credibility determinations simply because the evidence might support an alternate finding.' " *Song Wang v. Keisler*, 505 F.3d 615, 620-21 (7th Cir. 2007) (quoting *Kllokoqi v. Gonzales*, 439 F.3d 336, 341 (7th Cir. 2005)). We will uphold adverse credibility determinations unless the record compels a different conclusion. *See Tarraf v. Gonzales*, 495 F.3d 525, 532 (7th Cir. 2007).

In order to establish his claim for asylum, Soumare bore the burden of proving that he was unable or unwilling to return to Guinea because of a well-founded fear of persecution, on account of his political opinion, nationality, or membership in a particular social group. *See Sina*, 476 F.3d at 461-62; *Bejko v. Gonzales*, 468 F.3d 482, 484 (7th Cir. 2006); *see also* 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(a). If Soumare cannot meet his burden of proof for his asylum claim, it necessarily follows that he cannot make the "more stringent" showing required to prove his withholding-of-removal claim. *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 481 (7th Cir. 2007).

Because the IJ expressly found that Soumare's testimony was not credible, Soumare needed to provide either a convincing explanation of the discrepancies between his testimony and asylum applications, or evidence corroborating his testimony, in order to meet his burden of proof.

*See Aung v. Gonzales*, 495 F.3d 742, 746 (7th Cir. 2007); *Sina*, 476 F.3d at 462; *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004). Before an IJ may deny a claim for insufficient corroboration, the IJ must (1) make an explicit credibility finding; (2) explain why it is reasonable to expect additional corroboration; and (3) explain why the alien's explanation for not producing that corroboration is inadequate. *See Tandia v. Gonzales*, 487 F.3d 1048, 1054-55 (7th Cir. 2007); *Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006). "[T]he importance of corroboration depends in part on the degree of specificity and detail in a petitioner's story." *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004).

Based on the record, we believe that substantial evidence supports the IJ's finding that Soumare did not testify credibly. Soumare's testimony was not detailed, and it contradicted his asylum applications. *See Capric*, 355 F.3d at 1085 ("A credibility analysis assesses the applicant's claim only for internal consistency, detail, and plausibility, . . . ."). Soumare testified that he worked for RPG for six years, but could not recall what the letters RPG stood for, nor could he provide an approximation of how many people he recruited for RPG or the names of any individuals he recruited into the organization. Soumare could not definitively state when his father's store was vandalized or whether he or his brother managed the store at the time of the vandalism—even though Soumare claimed that he and his family were targeted by the Guinean regime because of suspicions that the income from the family business was being redirected to the rebels.

Most crucially, Soumare testified to suffering only one incident of physical mistreatment commencing on November 3, 2001. But both of his asylum applications stated that

he was mistreated in 1998; Soumare's second application detailed that in 1998 he was arrested, detained, and tortured for a full week. Soumare also wrote in his asylum applications that he and family members had been "convicted and sentenced" for funding the RPG rebels, but during his testimony he stated that he never appeared before a judge or in a court. The IJ reasonably did not credit Soumare's explanation for his conflicting testimony—that his application had been improperly transcribed—because Soumare prepared his second asylum application with the assistance of counsel. And, the IJ noted that the discrepancies were not minor deviations; Soumare retracted major events that went to "the heart of his claim." We completely understand why the IJ was skeptical when Soumare recanted his previous allegations that he was beaten and tortured for a full week in 1998, and when he reneged on his claim that he and his family had been convicted for their political activities.

After explicitly finding that Soumare had not met his burden of proof through credible testimony, the IJ properly demanded that Soumare corroborate his imprecise story. *See Eke v. Mukasey*, 512 F.3d 372, 381 (7th Cir. 2008); *Aung*, 495 F.3d at 746. But Soumare did not present any corroborating evidence apart from an untimely filed, untranslated RPG membership card. The IJ explained his reasons for refusing to admit the card, and stated that irrespective of its inadmissibility, the card could not sufficiently corroborate Soumare's testimony because the record did not establish that he feared persecution based solely on his RPG membership. The IJ noted that it was reasonable to expect Soumare to produce some form of corroboration, such as affidavits of third parties, or evidence relating to the family-run business that resulted

in backlash from the Guinean regime. The IJ also explained that Soumare made no effort to explain the absence of corroborating evidence. We see nothing in the record that leads us to doubt the IJ on these points.

The IJ outlined specific, cogent reasons that support his adverse credibility determination, *see Sina,* 476 F.3d at 461, and he explained why corroboration was necessary but absent, *see Eke*, 512 F.3d at 381. Because Soumare failed to prove his asylum claim, his withholding-of-removal claim fails *a fortiori*. *See Shmyhelskyy*, 477 F.3d at 481.


### III. CONCLUSION

We therefore DENY the petition for review.