In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-2179

ADEEL HASSAN CHATTA,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A78 865 668

_____

ARGUED FEBRUARY 13, 2008—DECIDED APRIL 21, 2008

_____

Before CUDAHY, POSNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* In September 2002, when he was
16 years old, Adeel Hassan Chatta, a citizen of Pakistan,
entered the United States at Chicago's O'Hare Interna-
tional Airport without a valid entry document. Immigra-
tion officials detained him at the airport and removal
proceedings were filed against him under 8 U.S.C.
§ 1182(a)(4)(A), as an alien who was likely to become a
public charge, and 8 U.S.C. § 1182(a)(7)(A)(i)(i), as an
alien who was not in possession of a valid immigration
document. Chatta applied for asylum, withholding of

removal, and protection under the United Nations Convention Against Torture. Following a hearing on his applications, the immigration judge denied relief. Chatta appealed to the Board of Immigration Appeals, which affirmed without opinion. Today we consider his petition for review of that decision.

In Chatta's interview with an immigration official at O'Hare, he said he was born in Pakistan in 1988, thus claiming to be 14 years old. He said he did not have a valid Pakistani passport and admitted that he had a false passport given to him by someone his father paid. Chatta also said he was a student headed to Canada. He denied any fear of returning to Pakistan and said he would not be harmed if he returned. Asked specifically whether he had any reservations about returning home because of his race, religion, nationality, political opinion, or membership in a particular social group, he said he did not.

At his hearing before the immigration judge, however, Chatta testified that he feared persecution and torture in Pakistan because of his religion and family membership. He said he was born in Jhamwala, Pakistan, a town of about 2,000 residents, in 1986, not 1988 as he had said at the airport. He said he lived in Pakistan with his parents, two older brothers, a sister, and his grandfather. His grandfather and parents remain in the family home, but his sister now lives with an aunt in another town. He said he is not sure where his brothers live. When he left Pakistan, Chatta was in the tenth grade. He said he left because he was "scared of some people and the police that I might be killed."

The reasons he gave for his fear involve a prominent Shi'a family in Jhamwala. Chatta's family is Sunni Muslim. Although most of his family is not particularly religious,

his grandfather belongs to the Deoband Sunni sect, and consequently his entire family is affiliated with that sect. Three Deoband families live in the town, and according to Chatta the majority of the other residents are Shi'a Muslims. He contends that in Jhamwala, two or three powerful Shi'a families own land. One of those families, also named Chatta but not related to our petitioner Chatta, is well-connected with politicians and police officers. (To minimize the confusion, we will refer to the petitioner as Chatta and to the other family as the Shi'a Chattas.)

The two families did not get along because of economic and religious differences. According to Chatta's testimony, in 2002 the Shi'a Chatta family directed its mosque to make insulting announcements over its external loud-speaker directed at the Deoband sect. Chatta's grandfather, oldest brother, and an individual from another Deoband family were angered and asked their Maulvi (religious leader) to do something about the broadcast. The Maulvi then broadcast, over the external loudspeakers of the Chatta family mosque, a message denouncing the message of the Shi'a Chattas. The Shi'a Chattas confronted the other Deoband family, which then left town. Chatta's father was worried that his family might have to leave town as well. Chatta's father and grandfather apologized to the Shi'a Chattas and sent Chatta's oldest brother to live in another town.

But two days later, three or four of the young men in the Shi'a family asked Chatta to sell drugs for them. He refused, and on his way home from school the men assaulted Chatta, who stayed home from school for a day or two. When he returned, the young men again asked him to sell drugs, and he again refused. He was attacked for a second time. This time Chatta was taken to a doctor

and his father reported the incident to the police; a copy of the report is in the record. Two or three days later, Chatta returned to school; again he was asked to sell drugs; and again he refused and was beaten.

Later, on Pakistan's Independence Day, Chatta and his brothers were riding around on motorbikes, celebrating. When they returned home, they heard their mother and sister screaming inside the house. When they entered, they saw their grandfather and mother tied up to pillars and their sister being held down in a rape attempt. Three or four of the same men who had previously attacked Chatta were in the house. Chatta's brother grabbed a kitchen knife and stabbed one of the men in the stomach. Chatta and his brothers rode away on their motorbikes. As they fled, Chatta's oldest brother was shot in the leg. The brothers went to a neighboring town, where they took the injured brother to a doctor and then telephoned their parents. Their father told him that "they" were looking for Chatta and his brothers. Chatta attributed the attack to religious differences between the families and the confrontation over the mosque broadcasts.

A week later, Chatta's father sent him to Canada, where he says he has relatives. Chatta also said he spoke to his parents after arriving in the United States and they told him the police continue to look for his brothers. Chatta says he could not live with relatives elsewhere in Pakistan because the police are controlled by the Shi'a Chatta family and he would be found and killed. In the record is an arrest warrant for Chatta in connection with the stabbing incident.

Other documentary evidence in the record includes an affidavit describing his family, his religious background, and the circumstances which led to his departure from

Pakistan. There are also newspaper and Internet articles, country condition reports prepared by both the United States Department of State and Amnesty International. Also, there are statements from his father, mother, grand-father, and the headmaster of his school. His mother's statement says that "his enemy will not let it go and will most probably kill him on his return." His father says that Chatta's "life is in danger here. And he will not be able to study here. When in America, he can complete his studies and his life will be out of danger." His grandfa-ther says Chatta's "enemies will not let it go." His head-master said that Chatta left school because of a "fight in the village."

In addition, Dr. Joan Liautaud testified at the hearing as to her diagnosis that Chatta suffers from post-traumatic stress disorder as a result of seeing his sister raped and being separated from his family.

In a careful and thorough decision, the immigration judge denied Chatta's request for relief. He found that Chatta was not credible because of (1) the discrepancies between the documentary evidence and Chatta's claim, (2) the blatant contradictions between Chatta's airport interview and subsequent asylum testimony regarding his age, his purpose for traveling to Canada, and whether he had a fear of returning to Pakistan, and (3) the im-plausibility of the circumstances surrounding the arrest warrant against him. In the face of Chatta's incredible testimony, the judge looked for corroborating evidence to bolster the claim for relief but found little support for his claim. Finally, the judge determined that, even if Chatta were believed, he failed to demonstrate past persecution or a well-founded fear of future persecution. He failed to show that the Pakistani government was

unable or unwilling to protect him and he could not show a well-founded fear of future persecution when his family remained unharmed in Pakistan. Further, any potential criminal prosecution that Chatta might face in Pakistan would be simple law enforcement, not persecution. We find there is substantial evidence in the record to support the immigration judge's conclusions.

When the Board of Immigration Appeals affirms an immigration judge's decision without comment, we review the immigration judge's decision because it is the final agency determination. *Qureshi v. Gonzales*, 442 F.3d 985 (7th Cir. 2006). The determination that a petitioner is not eligible for asylum must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 112 S. Ct. 812, 815 (1992); *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002).

To obtain asylum under 8 U.S.C. § 1158(a), an applicant must demonstrate by credible evidence that he (1) is statutorily eligible for asylum because he is a "refugee," and (2) merits a favorable exercise of discretion on the part of the Attorney General. *Jun Ying Wang v. Gonzales*, 445 F.3d 993 (7th Cir. 2006). A refugee is a person who is unable or unwilling to return to his home country because of past persecution or a well-founded fear of future persecution because of his race, religion, nationality, membership in a particular social group, or his political opinions. The burden is on the applicant to establish that he is a refugee. If the immigration judge concludes that an asylum applicant fails to present specific facts that he or she has been persecuted or has good reason to fear that he or she will be singled out for persecution in the future, we will not disturb that conclusion unless the

evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, at 483-84; *Sayaxing v. INS*, 179 F.3d 515, 519 (7th Cir. 1999).

The immigration judge clearly explained his reasons for finding that Chatta's testimony was not credible. There were material inconsistencies between Chatta's airport interview and his testimony at his hearing. It is true that we have found the airport interviews "are not always reliable indicators of credibility." *Dong v. Gonzales*, 421 F.3d 573, 579 (7th Cir. 2005). In certain cases, however, the interview can help support an adverse credibility finding. *Alimi v. Gonzales*, 489 F.3d 829 (7th Cir. 2007). The immigration judge found that the record of Chatta's airport interview had many markers of probative value and reliability. The record contained the actual transcript of the interview. The immigration official asked Chatta at least five times about his fear of returning to Pakistan. Chatta acknowledged that he understood the translator during the interview, and he admitted the accuracy of the transcripts during his hearing testimony. On the other hand, Chatta was young and, no doubt, frightened. However, given other evidence that bears on Chatta's credibility, reliance on the airport interview here was certainly reasonable.

There were also discrepancies between Chatta's claim and other evidence in the record. First, it is reasonable to doubt the claim that the Shi'a Chattas are all-powerful throughout the entire country. The State Department's International Religious Freedom Report indicates that the "vast majority" of the population in Chatta's home province of Punjab are Sunni Muslim. Even if the majority population in Jhamwala is, as Chatta claims, Shi'a, and if

the Shi'a Chattas have excessive power and influence in that town, it is reasonable to doubt that they have that power countrywide, and it is hard to believe that there would be no place in Pakistan for Chatta to be safe from their influence. The State Department's Country Report on Human Rights Practices in Pakistan indicates, ironically, that the police fail to protect Shi'a Muslims, not Sunnis.

There was substantial evidence for the immigration judge to find implausible that the police report arising out of the stabbing resulted from the Shi'a Chattas filing a false claim against him. The report was filed by one of the Shi'a Chattas, but others involved in the altercation were not Chattas. The judge also found it implausible, given that Chatta spoke to his family regularly, that he did not know whether the stabbing victim survived. All in all, for these reasons and others, the immigration judge found that Chatta's testimony was insufficient to support his claim that the arrest warrant was not legitimate and rather was a result of the Shi'a Chattas' power to persecute him through the local police based on religious differences and family affiliation.

Other evidence in the record also failed to convince the judge that the claim was true. The letters from Chatta's relatives and his headmaster do not support his claim in any detail. In short, it was reasonable for the judge to find that there is a real possibility that the arrest warrant is legitimate.

The significant hurdle that Chatta faces is that his claim involves that he was persecuted for his religion by private individuals of another religious sect. But when the persecutors are non-government actors, a respondent must show that the government perpetuated or condoned the persecution or was completely helpless to protect him. *Roman v.*

*INS*, 233 F.3d 1027 (7th Cir. 2000). As we already mentioned, the majority population of the country is Sunni. Even if the Shi'a Chattas were as powerful in Chatta's hometown as he says, it is difficult to see why he would be unsafe in other parts of the country. Further, he does not contest that he was involved in a stabbing, and he claims not to know the condition of the victim. It seems more likely that Chatta is afraid of legitimate criminal prosecution, not impermissible persecution. The investigation of incidents which would be crimes in the United States does not constitute persecution. *Guchshenkov v. Ashcroft*, 366 F.3d 554 (7th Cir. 2004). Substantial evidence in the record supports the conclusion of the immigration judge that Chatta has not established a persuasive claim to asylum.

To establish eligibility for withholding of removal under 8 U.S.C. § 1231(b)(3), Chatta must demonstrate a clear probability of persecution if removed to Pakistan. It must be more likely than not that he would be persecuted. *Prela v. Ashcroft*, 394 F.3d 515 (7th Cir. 2005). Because this standard is higher than that for asylum, this claim also fails.

To qualify for withholding of removal under the Convention Against Torture, Chatta must show that he likely would be subject to harm amounting to torture by the instigation of or with the consent of a public official. 8 C.F.R. § 1208.18(a)(1). He also fails to establish that he would be subject to torture.

For these reasons, the petition for review is DENIED.

CUDAHY, *Circuit Judge*, concurring in the judgment. I join in the result and in much of the rationale. I do not, however, agree with the apparent view of the majority and the Immigration Judge that the Shi'a Chattas could not have strongly influenced police in Chatta's village because of the demographic predominance of Sunnis in Pakistan. I think there is nothing incredible about a religious element wielding a local effective animus even though far from a majority factor in the country. But, by the same token, I am skeptical of a changed result on remand because Chatta could probably cure his own security problems by moving to a different area of Pakistan where the local situation would not place him in jeopardy. Hence, his exposure to persecution would be removed without requiring him to leave Pakistan and emigrate to the United States.