In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 07-1993 & 07-3178

EZATULLA ORYAKHIL,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

_____

Petitions for Review of Orders of the
Board of Immigration Appeals.
No. A99-027-098

_____

ARGUED FEBRUARY 26, 2008—DECIDED JUNE 17, 2008

_____

Before KANNE, SYKES, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* Ezatulla Oryakhil, a native and
citizen of Afghanistan, petitions for review of an order
of removal issued by an Immigration Judge (IJ), which
became final when the Board of Immigration Appeals (BIA)
dismissed his appeal. The IJ credited Oryakhil's testimony
that he has been, and will be, targeted by Taliban rebels
because of his position in the Afghan military and his
affiliation with the United States. However, the IJ also
determined that Oryakhil could reasonably relocate
within Afghanistan to avoid future harm. As a result, the

IJ denied Oryakhil's application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), and ordered Oryakhil removed to Afghanistan. Oryakhil also petitions for review of a final order of the BIA, denying his motion to reopen the IJ's decision based on material evidence that was previously unavailable. Because substantial evidence does not support the IJ's determination that Oryakhil could reasonably relocate to avoid future harm, we grant Oryakhil's petition for review of the final order of removal. Oryakhil's petition for review of the order denying his motion to reopen is therefore moot.

## I. HISTORY

Oryakhil attempted to enter the United States at Chicago O'Hare International Airport in September 2006. Oryakhil presented the immigration officer with a valid Afghan passport and an A-2 non-immigrant visa, *see* 8 C.F.R. § 214.1(a)(2), which had been revoked. The immigration officer denied Oryakhil entry to the United States, and Oryakhil was taken to a correctional facility in Illinois. The Department of Homeland Security commenced removal proceedings against Oryakhil one week later. Oryakhil responded by conceding removability and filing an application for asylum and withholding of removal, as well as for CAT protection, in October 2006.

The IJ elicited testimony at immigration hearings conducted on December 5 and December 6, 2006. Oryakhil's asylum application, affidavits, and testimony all revealed that Oryakhil began training for a career in the Afghan military in 1986, at the age of thirteen. After attending the Afghanistan Military College and the Afghanistan

Military University, Oryakhil began his military service in 1993 as Lieutenant and Company Commander in the North Afghanistan Army. Oryakhil served in this role until 1994; the two-year span was the only time he served in a combat role. In 1995, Oryakhil transferred to serve as Chief of Topography for the Kabul Intelligence Unit. When the Taliban seized power in 1996, Oryakhil was released from his military duties, but until 1997, Oryakhil collected a pension that the Taliban provided to all soldiers it dismissed from duty. After he left official military service, Oryakhil secretly sent intelligence reports to the forces in Northern Afghanistan that were resisting the Taliban.

When the United States and NATO toppled the Taliban regime in 2001, Oryakhil returned to his post in the Kabul Intelligence Unit, which was under the control of the new Karzai government. Upon resuming his military duties, Oryakhil attended the General Staff College, a military educational institution supported by NATO and the United States, which sought to implement new policies and procedures for the military of the new Afghan regime. Oryakhil completed the required courses at the General Staff College in four months and attained the second-highest grade-point-average at the College. Because of his outstanding achievement, the Afghan military asked Oryakhil to remain at the College as a teacher. Beginning in May 2003, Oryakhil taught English and computer skills at the General Staff College. Oryakhil did not live in military barracks while teaching at the college; he lived at his parents' home and commuted to and from work each day.

In 2005, American and NATO officers affiliated with the General Staff College invited Oryakhil to take advanced

English courses at the Defense Language Institute ("DLI"), a United States government training program located at Lackland Air Force Base in San Antonio, Texas. Oryakhil accepted the invitation, and in February 2006, Oryakhil traveled to the United States on an A-2 non-immigrant visa paid for by the United States. Oryakhil studied English at DLI for approximately six months, but he could not pass the tests required to continue his training at DLI. As a result, Oryakhil's visa was revoked. Oryakhil received a certificate of attendance from DLI, and went back to his family's home in Kabul on September 4, 2006.

Within days of his arrival in Afghanistan, Oryakhil attended a large family wedding. A day or two later, Oryakhil visited a cousin's house in another neighborhood of Kabul. At this point, news of Oryakhil's return had spread. While Oryakhil was at his cousin's house, four Taliban insurgents wearing black turbans and armed with rifles visited his parents' home in the middle of the night, and demanded to know Oryakhil's whereabouts and why the family had sent Oryakhil to the United States. Oryakhil's father immediately called Oryakhil at his cousin's house to warn him that he and his family were in danger. Oryakhil had heard many stories of other "disloyal" individuals that disappeared at the hands of armed Taliban militiamen who entered their homes at night. He decided that he was no longer safe in Kabul—which he believed to be the safest city in Afghanistan—and decided to return to the United States.

The next day, Oryakhil purchased an airline ticket back to the United States, but was told by the airline that the next flight would not leave for almost two weeks. About a week later, on September 14, 2006, Oryakhil met with his

commanding general at the General Staff College to check in for the first time since his return to Afghanistan. Oryakhil did not tell the officer that he believed that he was in danger or that he intended to flee Afghanistan. The officer told Oryakhil to report for duty two days later, but Oryakhil failed to report as instructed, though Oryakhil realized that his failure to report could result in a twelve-year prison sentence for desertion. Instead, Oryakhil made one final stop at his parents' home during daylight hours to collect his belongings, and left Afghanistan on September 19, 2006. Oryakhil attempted to reenter the United States when he was detained at O'Hare.

Oryakhil testified at his immigration hearing that he neglected to tell his commanding officer about the threats against his life by the Taliban because the General Staff College did not have sufficient soldiers to protect the school, and because military barracks no longer existed outside of Kabul—in Oryakhil's view, asking the officer for protection would have been futile. Oryakhil also testified that he did not carry a gun in his post as a teacher at the General Staff College, and that he feared that if he sought assistance from the military, it would further draw the Taliban's attention to Oryakhil's allegiance with the United States and would place his family in jeopardy. Oryakhil stated that if he returns to Afghanistan, he will likely be prosecuted for desertion because he failed to report for duty on September 16, 2006.

Oryakhil also presented corroborative testimony from Ann Carlin, an expert witness, who discussed the country conditions in Afghanistan. Carlin testified that since 2004, the Taliban insurgency has been bolstered by external financing, and that their attacks have augmented fourfold to an average of about 600 per month. Carlin

stated that the Afghan police force is too weak and inef-
fective to successfully quell the attacks; in fact, Carlin
stated that the police could "barely protect President
Karzai" from attack. Carlin elaborated that in addition to
targeting Americans, persons affiliated with America,
and Afghan army personnel, the Taliban has made many
threats against school teachers and health workers because
they see them as "easy targets." Carlin also explained
that the Taliban often carries out attacks against these
targets while they commute to and from work in the
evening, or at night while the targets sleep. In an affidavit
provided to the immigration court, Carlin noted that if
Oryakhil lived alone outside of his family home, he
might be at risk because he would be viewed suspi-
ciously given that Afghans live with their immediate
and extended families.

Along with the hearing testimony of Oryakhil and
Carlin, the IJ had before her an extensive record that
contained, among other things: affidavits from Oryakhil
and Carlin, Oryakhil's asylum application, Oryakhil's
certificate from DLI, State Department travel advisories
and reports on country conditions in Afghanistan, a
United Nations report on Afghanistan, and over two
dozen news reports and articles documenting the resur-
gence of the Taliban in Afghanistan in recent years.

On December 6, 2006, the IJ issued an oral decision, in
which she first concluded that Oryakhil had testified
credibly. The IJ noted that Oryakhil was consistent
throughout his applications and his testimony, and that
Oryakhil's story comported with the background mate-
rials, country conditions, and expert testimony in the
record. As a result, the IJ stated that it was "not necessary
to require any type of corroborating evidence." The IJ then

found that Oryakhil had demonstrated a reasonable fear of being violently harmed by members of the Taliban due to his travel to, and perceived affiliation with, the United States. The IJ stated that Oryakhil's attendance at the family wedding upon his return likely drew the Taliban's attention, and that "the government of Afghanistan is unable to control the Taliban, unable to control roving bands of individuals who may be associated with the Taliban, or acting under their auspices." Consequently, the IJ determined that the government could not protect Oryakhil if he remained at his parents' home. The IJ also found Oryakhil's testimony that he would subject his family to an increased risk of harm if he sought protection from the Afghan government to be "a credible statement, in light of country conditions."

Despite these findings, the IJ concluded that Oryakhil had not met his burden of proof on his claim for asylum because she believed that Oryakhil could have received protection from the Afghan military: "However, where the respondent's case fails, in this Court's estimation is that prior to leaving his country, he never sought to avail himself of any form of protection from the military where he served." The IJ recognized that Oryakhil had not engaged in any fighting or "combatant type of work, since 1994." The IJ acknowledged that this fact might make it difficult for Oryakhil to secure relocation or a different position in the military, but noted that, in any event, "he never sought that. He never sought any type of protection in the form of being allowed to live on any military barracks within Afghanistan, or within Kabul." The IJ also dismissed Oryakhil's claim that relocation through the military would no longer be an option to him—because he will be considered a deserter from the Afghan military

upon his return—by demanding documentary evidence from Oryakhil that would corroborate his desertion argument.

The IJ recognized the volatile political situation and turbulent conditions in Afghanistan, but curtly stated that Oryakhil "has not established to this Court's satisfaction that conditions, as chaotic and violent as they are throughout Afghanistan, are such that he could not have traveled to another part of the country within the military, and received some sort of relative safety." In support of this finding, the IJ noted that the Afghan military had provided Oryakhil with housing outside of Kabul when he served as a combatant between 1992 and 1994. She also noted that while Oryakhil might face harm outside of Kabul, this harm would not be on account of his affiliation with the United States, and was therefore irrelevant to his ability to relocate.

As a result, the IJ denied Oryakhil's applications for asylum and withholding of removal. The IJ also denied Oryakhil's application for CAT protection because he had not claimed that he would be subject to extreme mental suffering or physical pain at the direction or acquiescence of the Afghan government. The IJ ordered Oryakhil removed to Afghanistan. Oryakhil appealed to the BIA, which concluded that the IJ had considered all relevant evidence before her. The BIA issued a short opinion and dismissed Oryakhil's appeal in April 2007. Oryakhil timely filed a petition for review of the final order of removal with this court in May 2007.

Oryakhil then filed a motion to reopen with the BIA in July 2007, seeking to submit previously unavailable evidence: (1) a letter from his father describing the Taliban's continued efforts to capture Oryakhil and

terrorize his family, and (2) a letter he termed an "arrest warrant" that was sent from his commanding officer in the Aghan Army to the Afghan police, requesting that the police investigate Oryakhil's failure to report for duty. The BIA denied Oryakhil's motion to reopen as untimely. In September 2007, Oryakhil filed a new petition for review with this court—this time taking issue with the BIA's denial of his motion to reopen. Thereafter, we consolidated both petitions for review.

## II. ANALYSIS

In his petitions for review, Oryakhil contends that the IJ's decision to deny him asylum and remove him to Afghanistan was not supported by substantial evidence because the record does not demonstrate that he could reasonably relocate within Afghanistan. Oryakhil also argues that, even if the BIA properly affirmed the IJ's asylum decision, the BIA improperly denied his motion to reopen, which was based on newly discovered evidence. Oryakhil does not challenge the IJ's determination that he was not entitled to relief under CAT, and he also failed to raise his CAT claim in his brief before the BIA; he has therefore waived judicial review on that claim. *See Haxhiu v. Mukasey*, 519 F.3d 685, 692 (7th Cir. 2008).

Because the BIA relied on the IJ's decision when it dismissed Oryakhil's appeal of the final order of removal, we review the IJ's decision as supplemented by the BIA. *See Khan v. Mukasey*, 517 F.3d 513, 517 (7th Cir. 2008); *Pavlyk v. Gonzales*, 469 F.3d 1082, 1087 (7th Cir. 2006). We must uphold the decision to deny relief so long as it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Chatta v.*

*Mukasey*, 523 F.3d 748, 751 (7th Cir. 2008); *Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007). We will overturn the decision to deny relief "only if the record compels a contrary result." *Mema*, 474 F.3d at 416; *see also Shmyhelskyy v. Gonzales*, 477 F.3d 474, 478-79 (7th Cir. 2007).

In order to establish his claim for asylum, Oryakhil bore the burden of proving that he was unable or unwilling to return to Afghanistan because of past persecution or a well-founded fear of persecution, on account of his race, religion, political opinion, nationality, or membership in a particular social group. *See Soumare v. Mukasey*, 525 F.3d 547, 552 (7th Cir. 2008); *Haxhiu*, 519 F.3d at 690; *Shmyhelskyy*, 477 F.3d at 479; *see also* 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(a). The IJ and BIA both implicitly analyzed Oryakhil's claim as one based on a well-founded fear of future persecution rather than one based on past persecution. Oryakhil has not yet been attacked by the Taliban, but bases his claim on a fear that he will be in danger if he returns to Afghanistan. We therefore agree that the matter is more appropriately analyzed as a claim based on a fear of future persecution. *Agbor v. Gonzales*, 487 F.3d 499, 502 (7th Cir. 2007).

Because Oryakhil's claim is based upon a well-founded fear of future persecution, he also bore the burden of proving that he cannot reasonably relocate to another part of his home country to avoid persecution. *See* 8 C.F.R. §§ 208.13(b)(2)(ii), 208.13(b)(3)(I) ("In cases in which the applicant has not established past persecution, the applicant shall bear the burden of establishing that it would not be reasonable for him or her to relocate, unless the persecution is by a government or is government-sponsored."); *see also Song Wang v. Keisler*, 505 F.3d 615, 622 (7th Cir. 2007); *Agbor*, 487 F.3d at 505; *Rashiah v. Ashcroft*,

388 F.3d 1126, 1132 (7th Cir. 2004). The immigration regulations contemplate two separate inquiries to determine whether an applicant could reasonably relocate within his home country: (1) whether safe relocation is possible, and if so, (2) whether it would be reasonable to expect the applicant to safely relocate. *See* 8 C.F.R. §§ 208.13(b)(2)(ii), 208.13(b)(3)(I); *Mohamed v. Ashcroft*, 396 F.3d 999, 1006 (8th Cir. 2005) ("Relocation must not only be possible, it must also be reasonable."); *Gambashidze v. Ashcroft*, 381 F.3d 187, 192 (3d Cir. 2004) ("Thus the regulation envisions a two-part inquiry: whether relocation would be successful and whether it would be reasonable."); *Knezevic v. Ashcroft*, 367 F.3d 1206, 1214 (9th Cir. 2004) ("Having determined that it would be safe for the Knezevics to relocate to the Serb-held parts of Bosnia-Herzegovina, we must examine the evidence as to whether it would be reasonable to require them to do so . . . ."); *see also Das v. Gonzales*, 219 F. App'x 543, 546 (7th Cir. 2007) (unpublished decision). We therefore ask whether safe relocation was both (1) possible and (2) reasonable for Oryakhil.

Neither the IJ, nor the BIA, explained how it would be possible for Oryakhil to safely relocate within Afghanistan. In her oral decision, the IJ stated that Oryakhil never told his military supervisor that he had been threatened by the Taliban, or that he planned to flee the country. The IJ found that Oryakhil "never sought to avail himself of any form of protection from the military where he served." But this statement alone says nothing about whether relocation through the military is *possible* for Oryakhil—it merely states that Oryakhil did not attempt to relocate. Because he did not attempt to pursue relocation through the military, the IJ should have asked a counterfactual

question: if Oryakhil returns to Afghanistan, re-enters the Afghan military, and asks for a military relocation, would the military honor his request? The IJ refrained from asking or answering this question, and instead penalized Oryakhil for his failure to ask for a military relocation. Despite this defect in the IJ's reasoning, the BIA erroneously allowed the decision to stand.

From the record, we are not at all certain that a military relocation is possible for Oryakhil. In fact, Oryakhil presented ample evidence that military relocation would be impossible. First, the IJ credited Oryakhil's testimony that he had not engaged in any fighting or combat activity since his tenure in North Afghanistan in the early 1990s, and the IJ acknowledged that this might make it difficult for Oryakhil to be reassigned within the military. Second, the IJ received testimony from Oryakhil that military relocation is no longer an option for Oyakhil because he deserted his post when he failed to report for duty at the request of his commanding officer; Oryakhil elaborated that he will be prosecuted and imprisoned for desertion if he returns to his military post. The IJ dismissed this point by improperly demanding corroborating evidence from Oryakhil; however, Oryakhil's testimony should have sufficed because the IJ found that he was a credible witness, and explicitly stated that corroborating evidence was "not necessary." *See Diallo v. Ashcroft*, 381 F.3d 687, 695 (7th Cir. 2004) ("Diallo's testimony, if credible . . . was 'sufficient to sustain the burden of proof without corroboration.'" (quoting 8 C.F.R. § 208.13(a))). Once the IJ established that Oryakhil was credible, it was improper for her to credit certain portions of his testimony and discount others without further explanation as to why Oryakhil's testimony was unacceptable and

why corroborating evidence was required. *See Tolosa v. Ashcroft*, 384 F.3d 906, 910 (7th Cir. 2004); *cf. Soumare*, 525 F.3d at 552 ("Before an IJ may deny a claim for insufficient corroboration, the IJ must (1) make an explicit credibility finding; (2) explain why it is reasonable to expect additional corroboration; and (3) explain why the alien's explanation for not producing that corroboration is inadequate." (citing *Tandia v. Gonzales*, 487 F.3d 1048, 1054-55 (7th Cir. 2007); *Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006))).

The only evidence noted by the IJ that potentially supports the possibility of military relocation is the fact that the military provided housing for Oryakhil in North Afghanistan from 1992 to 1994. But this evidence is hardly "substantial." Given the tumultuous social and political landscape of Afghanistan over the last seven years since the fall of the Taliban regime, the conditions that existed nearly a decade before the U.N. invasion of Afghanistan are not even probative of the military's present capabilities. And the military's current state is well-documented in the evidence presented by Oryakhil: the credible testimony of Oryakhil and Carlin, as well as the news stories and country reports admitted into the record, consistently reveal that the Afghan military has very few barracks and little control over the region outside of Kabul and that the Afghan military is not outfitted with equipment or housed in barracks comparable to their American and U.N. counterparts.

Moreover, we do not see substantial evidence that Oryakhil could achieve a safe relocation through the military. The credible testimony from Oryakhil and corroborating evidence in the record shows that the Taliban insurgency is stronger outside of Kabul, and that the

Afghan military has less control over the surrounding areas. The IJ admitted that the Afghan government could not "control the Taliban, [and is] unable to control roving bands of individuals who may be associated with the Taliban, or acting under their auspices." The IJ equivocally stated that through the military, Oryakhil could receive "some sort of relative safety." This ambivalence in the IJ's tone is emblematic of the fact that the evidence is simply insubstantial to support the conclusion that safe relocation through the Afghan military is possible for Oryakhil.

Finally, substantial evidence does not support the immigration courts' conclusion that safe relocation would have been reasonable for Oryakhil. The immigration regulations set out several factors in determining whether a relocation is reasonable, including "any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 208.13(b)(3). The BIA concluded that the IJ had considered these factors. However, the record does not reflect that conclusion. The IJ conceded that Oryakhil might face harm outside of Kabul, but dismissed this fact because she believed that any harm suffered outside of Kabul would not be "persecutive in nature." Not only does this seem strikingly inconsistent with the IJ's recognition that the Taliban insurgency is stronger outside of Kabul, but this finding ignores the regulation's direction that an IJ consider "ongoing civil strife" in determining whether relocation is reasonable. *See id.*; *Das*, 219 F. App'x at 546 (unpublished decision).

Oryakhil also testified credibly that his family resided in Kabul. Carlin testified to the same, and added that if

Oryakhil moved outside of his family home, he would be viewed with skepticism and further targeted by the Taliban. But the IJ ignored these "familial ties" because she found that Oryakhil had lived away from his family in North Afghanistan from 1992 to 1994, even though the record makes evident that Oryakhil has not lived away from his family or participated in combat in nearly fifteen years—a span that has seen the rise and fall of the Mujahideen, the rise and fall of the Taliban, the assumption of control by the Karzai government, and the reinvigoration of Taliban insurgents. The IJ even acknowledged that Oryakhil's testimony that he would place his family in greater peril by seeking protection from the Afghan government was "a credible statement, in light of country conditions." To expect Oryakhil, after several years of teaching, to revert to a soldier's lifestyle in a hostile, conflict-ridden region of Afghanistan—and to place his family in jeopardy by doing so—does not strike us as "reasonable."

Based on the evidence in the administrative record, we are compelled to disagree with the BIA and the IJ. Substantial evidence simply does not demonstrate that it would be either possible or reasonable for Oryakhil to relocate within Afghanistan. We therefore will remand the case for further proceedings. On remand, Oryakhil will have an opportunity to introduce the letters from his father and his commanding officer that he appended to his motion to reopen. These submissions may further bolster Oryakhil's claims. *See BinRashed v. Gonzales*, 502 F.3d 666, 673 (7th Cir. 2007); *Adekpe v. Gonzales*, 480 F.3d 525, 532-33 (7th Cir. 2007). Therefore, we need not consider his petition for review of the motion to reopen because it is moot.

### III. CONCLUSION

We GRANT the petition for review of the order of removal, VACATE the order of removal, and REMAND for further proceedings consistent with this opinion. We DISMISS the petition for review of the motion to reopen as moot.

USCA-02-C-0072—6-17-08