# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-3196

PAULINE NDONYI,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A78-674-466.

_____

ARGUED JUNE 5, 2008—DECIDED SEPTEMBER 2, 2008

_____

Before POSNER, KANNE, and SYKES, *Circuit Judges*.

KANNE, *Circuit Judge*. Pauline Ndonyi, a native and
citizen of Cameroon, petitions for review of an order of
removal entered by Immigration Judge Jennie L.
Giambastiani (IJ), which became final when the Board of
Immigration Appeals (BIA) dismissed Ndonyi's appeal.
The IJ and the BIA both concluded that the harsh treat-
ment Ndonyi suffered in Cameroon was not on account

of her political, religious, or social affiliations, and denied her application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Because the IJ and the BIA failed to properly analyze the nexus between the persecution faced by Ndonyi and her political and religious beliefs, we grant the petition for review and remand the case for further proceedings.

## I. HISTORY

In May 2000, Pauline Ndonyi entered the United States at Detroit, Michigan, by crossing the border in a Canadian family's car. The agent at the border station checked only the driver's passport, and waived the car through the border; as a result, Ndonyi entered the United States undetected. In December 2000, Ndonyi, who was not yet in removal proceedings, filed an application for asylum, withholding of removal, and CAT protection, because she claimed to have suffered persecution as a result of her political activities and her father's leadership in the Cameroon Baptist Convention ("CBC"), a Baptist Christian organization. Ndonyi's application detailed that "[i]n January 1999, [she] was tortured and raped by the government police and military for expressing [her] political opinion." The application also stated that "in September 1999, [she] was forced to watch [her] father being tortured for his involvement with the Church," and that "[she] and [her] mother both were tortured for trying to come to his defense." Ndonyi's application claimed that, based on her past experience, she feared being "tortured and killed" if she returned to Cameroon.

An asylum officer interviewed Ndonyi, *see* 8 C.F.R. § 1208.9, and after determining that she was inadmissible, the officer referred Ndonyi's application to the Executive Office of Immigration Review, *see id.* § 1208.14(c)(1). The government then initiated removal proceedings against Ndonyi in early February 2001 for being illegally present in the United States. *See* 8 U.S.C. § 1182(a)(6)(A)(i).

In September 2002, Ndonyi appeared with counsel at a hearing before the IJ. Ndonyi, a native English speaker, testified that she is a member of the Kom tribal group, an ethnic group located in the English-speaking northwest province of Cameroon. Ndonyi explained that French and English are the two official languages of Cameroon, but that French is the more prevalent language and English speakers, or "Anglophones," are often treated as second-class citizens.

Ndonyi stated that for two years, beginning in 1997, she attended the University of Yaoundé ("University"), which is located in a French-speaking part of the country. According to Ndonyi, the University discriminated against its Anglophone students by omitting their names from student lists; barring them from participation in sports and extracurricular activities; relegating them to dirty, substandard housing; and neglecting to grade their academic papers or record their course grades—which resulted in the students failing to receive proper credit for courses they completed and prevented their advancement to higher grade levels. In response to the University's discriminatory policies, English-speaking students formed the Northwest Students Association ("NSA"), an

organization of a few hundred members that attempted to vindicate the interests of the school's Anglophone students by conducting peaceful demonstrations, boycotts of classes, and strikes targeted at school administrators. Although the NSA regularly posted fliers and engaged in protests during Ndonyi's two years at the University, the school administration did not permit the NSA to function in the school, so members met secretly, and their actions were met with resistance from school officials.

Ndonyi joined and actively participated in the NSA while at the University. Ndonyi testified that in mid-January 1999, she and other NSA members engaged in a peaceful "strike" in front of the University's administration building when school administrators called the police. The police arrived in trucks, and were armed with guns and clubs. Ndonyi explained that the police told the students that the students were disturbing the peace, and that the police were going to "teach them a lesson" for their disruptive behavior. The police beat the students with the clubs and pushed the students into the trucks.

Ndonyi recounted how the police then took the students to the police station, where they separated the male students from the female students. Ndonyi and the other female students were forced into a "nasty looking" cell. Police officers entered the cell, and kicked and beat Ndonyi and the other female students with clubs. During this incident, two officers held her down while other officers took turns raping her. The other girls in the room

were also raped by the police. The students were held overnight and released the next morning without being charged with any offense. Ndonyi testified that upon her release from the prison, she went to the hospital to obtain treatment for her injuries, but did not report the episode to other authorities. A close friend of Ndonyi's, Rosalyina Disango, died as a result of the incident. Ndonyi became angry when Rosalyina's death was misreported as a suicide, and as a result, Ndonyi attempted to contact members of the press to have the true story of her friend's death published. The government discovered Ndonyi's efforts to contact the press and summoned her to the police station in late January 1999. Ndonyi did not report to the station and instead fled 420 miles to her home province.

Ndonyi explained that upon arriving in the northwest province, she did not go directly to her parents' home in Mabingo, but instead stopped in another town 30 miles away because "the situation at home . . . was also bad." Since 1994, there had been hostility toward her family in her home province because her father was the chairman of the CBC. Ndonyi's father and her family faced backlash after her father refused to "break away" from the church and join a splinter group—the Cameroon National Baptist Christian Convention ("CNBC"), which objected to how the CBC spent church funds. The CBC and CNBC members attended the same church, which led to social hostilities directed at CBC members—including name-calling, shunning, and stone throwing. Ndonyi's father's attempt to inform the authorities about the oppressive actions of CNBC members fell on deaf ears because the authorities were affiliated with the CNBC.

After a few weeks in the nearby village, Ndonyi re-
turned to her parents' home. Ndonyi's initial hesitation
to returning home proved warranted—from February until
September 1999, her family was under *de facto* house
arrest: "[W]e couldn't go out . . . we were being stoned,
called names. They wouldn't . . . even interact with us. So
basically we just stay[ed] home." Ndonyi also detailed
that CNBC members left letters tacked to her family's
front gate threatening to burn down their home because
of her father's continued allegiance to the CBC.

The efforts by Ndonyi's father to publicize the family's
plight exacerbated the situation. In early September 1999,
Ndonyi's father was arrested for writing a letter to gov-
ernment officials in the Cameroonian Senate, discussing
how the local government supported the CNBC instead
of neutrally resolving the dispute between the two
Baptist sects. The letter brought no response; Ndonyi
speculated that the politicians were silenced because the
political landscape was dominated by French speakers,
who advanced their own agendas and causes. The local
officials branded Ndonyi's father a "traitor" and a trouble-
maker, and arrested him for going over their heads to the
higher authorities.

Two weeks later, the entire Ndonyi family, along with
other CBC members, was arrested and "locked up" by
uniformed police. The family was taken to a maximum
security prison in Bamenda, where local officials at-
tempted to get Ndonyi's father and other CBC members
to sign documents that stated they would "stop" opposing
the CNBC. Several CBC members signed the forms and

were released, but Ndonyi's father refused to sign, and the family was detained for two weeks. During the two-week imprisonment, the police tortured Ndonyi's father in front of the entire family—four officers took him out of his cell, hung him from handcuffs placed around metal bars on a wall, and then beat his legs and body with clubs. The officers told the family that this should be a "lesson" to them. When her father began to pass out, Ndonyi could no longer stand idly by—she jumped on top of one of her father's assailants and was bludgeoned in the head with the butt of a rifle.

When Ndonyi awoke, she was being treated by one of her father's supporters, and was informed that her family had been released. Ndonyi's family had returned to their home in Mabingo, where CNBC members continued to intimidate and socially censure them and the other CBC members. Ndonyi explained that her family returned to Mabingo because it was unlikely that the English-speaking family could find work or get an education in the French-speaking parts of Cameroon. Ndonyi did not want to witness her family subjected to discrimination in Mabingo, so instead of returning home, she traveled 60 miles to another town, Baffouse, where she stayed with her father's supporters. While in Baffouse, Ndonyi learned that two military officers had shown up at her parents' home and asked for her whereabouts. When her mother refused to tell the officers where Ndonyi was, she was badly beaten.

Ndonyi lived in Baffouse for six months when she decided to leave Cameroon. Ndonyi obtained documenta-

tion and a fraudulent passport from a friend, and traveled to Canada on another woman's business visa. About one week later, Ndonyi crossed the border into the United States. Once in the United States, Ndonyi began attending a nursing program at a technical college in Madison, Wisconsin. At one point, Ndonyi attempted to transfer her school credits over from the University of Yaoundé, but the school had no records of Ndonyi: "[it was] like I didn't even exist . . . in the school. They couldn't find any records for my name."

Ndonyi also testified that, in June 2001, she discovered that her father had passed away under suspicious circumstances. She explained that her family still faced persecution from the CNBC and police at the time of her immigration hearing. And she said that she would not return to Cameroon for fear of being raped, tortured, or arrested, because her family no longer has income after her father's death, and because she will be a victim of torture for her support of English-speaking causes.

After Ndonyi completed her testimony on direct examination, the IJ continued the hearing twice, and ultimately rescheduled cross-examination for early December 2003. During the intervening fifteen months, Ndonyi's counsel withdrew. As a result, Ndonyi represented herself at the December 2003 hearing. On cross-examination, the government's attorney asked Ndonyi about the rallies and protests she participated in while part of the NSA, and the number of students involved with the group. Ndonyi related consistent stories about the January 1999 protest and her rape and torture in its aftermath, and about her

family's membership in the CBC and the December 1999 incident.

However, the government's attorney also elicited several numerical estimates from Ndonyi that differed from those she had testified to more than a year earlier on direct examination. For example, on cross-examination Ndonyi estimated that the NSA had only 200 members (instead of 400), that she participated in five rallies (not ten), and that only 50 to 100 students protested in January 1999 (as opposed to 200). Ndonyi explained that the specific figures she gave might be inaccurate because she did not pay close attention to details and was merely estimating.

In addition to Ndonyi's testimony, the record before the IJ consisted of, among other things: (1) an affidavit from an American missionary in Cameroon regarding Ndonyi's father's activities in the CBC; (2) the State Department's 2001 and 2002 *Country Reports on Human Rights Practices* in Cameroon; (3) an editorial regarding the religious conflict that Ndonyi's father published in a national newspaper; (4) a medical certificate from Ndonyi's hospital visit in January 1999; (5) Ndonyi's father's obituary; and (6) a threatening letter that CNBC members sent to Ndonyi's father. The missionary's affidavit stated that "the Ndonyi family suffered more persecution than most families loyal to the CBC . . . because Pauline Ndonyi's father was a leader in the CBC church . . . and he openly . . . reported the activities of dissidents to the CBC authority." The missionary further explained that Ndonyi's father's affiliation with the CBC

"prevented them from worshipping in their local church . . ., ostracized them from local civic and religious functions, and maligned them in public gatherings." The State Department reports confirmed that "natives of the two Anglophone provinces, the Northwest and Southwest Provinces . . . have suffered disproportionately from human rights violations committed by the Government and its security forces." The reports elaborated that Anglophones are "largely underrepresented in the public sector," and "generally believed that they had not received their fair share of public goods and services."

The IJ reviewed the record and rendered an oral decision on December 8, 2003, the same day that Ndonyi testified on cross-examination. The IJ first found that Ndonyi was not credible due to "several discrepancies" between her testimony on direct examination and her cross-examination testimony, given more than a year later. The IJ noted several differences, including the number of protests Ndonyi claimed to have participated in, the number of NSA members that Ndonyi cited, the number of students who participated in the NSA protest and were arrested in January 1999, and the number of trucks the police arrived in to arrest the students. The IJ explained that despite Ndonyi's confession that she did not pay close attention to detail, "the numbers [were] significant." The IJ also stated that Ndonyi was not credible because she had testified "on direct examination . . . that when she fought with the soldiers who were beating her father in September of 1999 and she was hit on the head, she was hospitalized . . . . However, today she testified that after she was hit on the head, she passed out, [and] did not require any hospitalization or medical treatment . . . ."

The IJ next found that Ndonyi's claims of persecution were not sufficiently related to her political opinion. "With regards to the sexual assault, as deplorable and despicable an act as that was, the respondent has failed to show that it was on account of her political opinion." The IJ continued, "[S]he has failed to establish a nexus that she was 'singled out on account of her political opinion' when she was assaulted and jailed." The IJ stated that the protestors may have been jailed for disturbing the peace or for attempting to break into an administrative office, and not for protesting.

The IJ also stated that Ndonyi's treatment in December 1999 while defending her father was unrelated to her Baptist faith: "I do not find that she was hit because of her Baptist faith, nor because of her father's Baptist faith. She went against a soldier or a policeman and regrettably bore the brunt of his wrath for interfering while he was performing his duties." While the IJ acknowledged that Ndonyi's father was singled out because of the dispute between the CBC and CNBC, the IJ stated, "I can find no nexus presented by the respondent that would tie her to persecution on the basis of her father's affiliation."

The IJ ultimately concluded that Ndonyi had not established past persecution, or a well-founded fear of future persecution, on account of her political opinion, religion, or membership in a particular social group, and the IJ denied Ndonyi's applications for asylum and withholding of removal. The IJ then stated that Ndonyi's testimony was insufficient to conclude that she would be imprisoned and tortured by the Cameroonian govern-

ment, and denied her request for CAT protection. The IJ ordered Ndonyi removed to Cameroon.

Ndonyi filed a timely *pro se* appeal of the IJ's order with the BIA in January 2004. In March 2005, the BIA adopted and affirmed the IJ's conclusions that Ndonyi had not testified credibly because the discrepancies identified by the IJ "adequately place[d] the respondent's testimony into question." In April 2005, Ndonyi petitioned for review of the BIA's decision with this court. And in October 2005, the government filed an unopposed motion to remand the case to the BIA because the IJ's adverse credibility determination was based in part on her erroneous conclusion that Ndonyi had testified inconsistently regarding being hospitalized following the September 1999 incident. We granted the government's motion and remanded the case to the BIA in November 2005.

Ndonyi retained counsel in May 2007, and in August 2007 the BIA reconsidered the case and issued a new decision vacating its prior decision, and dismissing Ndonyi's appeal. After reconsidering the case, the BIA determined that it "agree[d] with the [IJ's] conclusion that taking [Ndonyi's] testimony as true, she did not meet her burden of proof for relief." The BIA stated that Ndonyi's brutal treatment while incarcerated rose to the level of past persecution, but the BIA found that Ndonyi did not establish that her "mistreatment was on account of a political opinion, particular social group, or other enumerated ground." "[T]he demonstration was not political, and they were only protesting the University's

discrimination." The BIA attributed Ndonyi's treatment to harsh prison conditions and "circumstance," rather than to her political views, her religion, or her father's leadership in the CBC. The BIA concluded that "even accepting that the past events in their totality amounted to past persecution," the government rebutted the presumption of a well-founded fear of future persecution because Ndonyi could reasonably "relocate away from the University and her hometown . . . ." The BIA stated, "We acknowledge her testimony that she will face discrimination . . . and the evidence indicating that Anglophones have historically had issues in Cameroon . . . . While these factors are not insignificant, we do not find proof of a level of hardship which would establish that internal relocation would be unreasonable." Ndonyi timely filed a petition for review of the BIA's decision with this court in September 2007.

## II. ANALYSIS

Because the BIA adopted and supplemented a portion of the IJ's decision, we review that part of the IJ's decision along with the additional reasoning provided by the BIA. *See Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008); *Khan v. Mukasey*, 517 F.3d 513, 517 (7th Cir. 2008). We review the decisions under the "substantial evidence" standard. *Ogayonne v. Mukasey*, 530 F.3d 514, 518-19 (7th Cir. 2008). Under this standard, "[w]e must uphold the decision to deny relief so long as it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Oryakhil*, 528 F.3d at 998

(quoting *Chatta v. Mukasey*, 523 F.3d 748, 751 (7th Cir. 2008), and *Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007)). "We will overturn the decision to deny relief 'only if the record compels a contrary result.'" *Id.* (quoting *Mema*, 474 F.3d at 416); *see also Ogayonne*, 530 F.3d at 518-19.

Ndonyi challenges the denial of her application for asylum and withholding of removal on several grounds.[1] First, Ndonyi asserts that the IJ made an improper adverse credibility determination before denying her application. But because the BIA assumed that Ndonyi was a credible witness when it dismissed her appeal in October 2007, the IJ's adverse credibility determination is irrelevant to our review; we will assume, as the BIA did, that Ndonyi's testimony credibly established a fear of past persecution. *See Gonzalez v. INS*, 77 F.3d 1015, 1023 (7th Cir. 1996); *see also Kayembe v. Ashcroft*, 334 F.3d 231, 235 (3d Cir. 2003).

Ndonyi also argues that the IJ and BIA deprived her of procedural due process under the Fifth Amendment by refusing to fully consider her evidence, and by misapplying the law to her case. However, we have repeatedly stated that "immigration proceedings that meet statutory

---

[1] Ndonyi has failed to raise her CAT claim in her brief before this court, and we see no "manifest error" in the immigration courts' reasoning on that claim. She has therefore waived judicial review on her claim for CAT protection. *See Haxhiu v. Mukasey*, 519 F.3d 685, 692 (7th Cir. 2008); *cf. Oryakhil*, 528 F.3d at 997 (finding waiver where petitioner did not raise claim before the court of appeals or the BIA).

and regulatory standards comport with due process, and, as such, aliens are better-served by arguing instead that immigration proceedings infringed the statutory and regulatory right to a reasonable opportunity to present evidence." *Khan*, 517 F.3d at 518; *see also Hussain v. Keisler*, 505 F.3d 779, 781 (7th Cir. 2007); *Kadia v. Gonzales*, 501 F.3d 817, 824 (7th Cir. 2007). And Ndonyi has not advanced a colorable challenge to the immigration courts' evidence-gathering process, but instead argues that they derived improper inferences from the facts and misapplied the law in arriving at their asylum determinations. We will evaluate these arguments as part of Ndonyi's substantive challenge to the immigration courts' denial of her application for asylum and withholding of removal.

In order to establish her claim for asylum, Ndonyi bears the burden of proving that she is unable or unwilling to return to Cameroon because of past persecution or a well-founded fear of persecution, on account of her race, religion, political opinion, nationality, or membership in a particular social group. *See Oryakhil*, 528 F.3d at 998; *Soumare v. Mukasey*, 525 F.3d 547, 552 (7th Cir. 2008); *see also* 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13. A request for withholding of removal seeks relief under the Immigration and Nationality Act, "which prohibits the removal of a person to a country where his 'life or freedom would be threatened . . . because of [his] race, religion, nationality, membership in a particular social group, or political opinion.'" *BinRashed v. Gonzales*, 502 F.3d 666, 670 (quoting 8 U.S.C. § 1231(b)(3)(A) (alteration in original)). "To be eligible for withholding of removal, an applicant

must demonstrate a clear probability of persecution." *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 481 (7th Cir. 2007); *see also INS v. Stevic*, 467 U.S. 407, 410 (1984)). The required showing for withholding of removal is "more stringent" than an applicant's burden of proof on an asylum claim. *Shmyhelskyy*, 477 F.3d at 481; *see also Soumare*, 525 F.3d at 552.

In arguing that the BIA and IJ substantively erred by denying her application for asylum and withholding of removal, Ndonyi contends that the record established past persecution and a well-founded fear of persecution based on her political opinion and religious views. She writes in her brief, "The record indicates that [she] was arrested, detained and sexually assaulted as a result of her participation in an NSA protest, which aimed to end discrimination against the Anglophone minority." She continues, "The record also demonstrates that [she] and her family suffered persecution because of their Baptist faith and her father's CBC membership."

Through her testimony and corroborating submissions, Ndonyi presented an abundance of evidence of past abuse. She detailed the facts of multiple arrests without legitimate cause, several severe beatings, and a violent rape. These incidents clearly represent a "punishment or . . . infliction of harm . . . that this country does not recognize as legitimate." *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007). Such egregious, repetitive acts of physical cruelty—including one incident that required Ndonyi to be hospitalized—clearly rise to the level of past persecution if they occurred "on account of" Ndonyi's political

opinion or religious views. *See Tchemkou v. Gonzales*, 495 F.3d 875, 791-93 (7th Cir. 2007); *Cecaj v. Gonzales*, 440 F.3d 897, 899 (7th Cir. 2006). This circuit and several other circuits have adopted the doctrine of "mixed motives," " 'which recognizes that an individual may qualify for asylum if his or her persecutors have more than one motive as long as one of the motives is specified in the Immigration and Nationality Act.' " *Gjerazi v. Gonzales*, 435 F.3d 800, 812 (7th Cir. 2006) (quoting *Mohideen v. Gonzales*, 416 F.3d 567, 570 (7th Cir. 2005)); *see also De Brenner v. Ashcroft*, 388 F.3d 629, 636 (8th Cir. 2004); *Lopez-Soto v. Ashcroft*, 383 F.3d 228, 236 (4th Cir. 2004); *Girma v. INS*, 283 F.3d 664, 667 (5th Cir. 2002); *Borja v. INS*, 175 F.3d 732, 735-36 (9th Cir. 1999); *Chang v. INS*, 119 F.3d 1055, 1065 (3d Cir. 1997).

In determining that Ndonyi did not suffer "on account of" her political opinions regarding Anglophone rights, the BIA completely ignored the doctrine of mixed motives—the opinion does not analyze whether Ndonyi's oppressors were partially motivated by politics or religion, and makes no mention of any of our precedent on the issue. The IJ and the BIA also "failed to consider the evidence as a whole, as [they were] required to do by the elementary principles of administrative law." *Cecaj*, 440 F.3d at 899. The IJ stated that Ndonyi may have been jailed for disturbing the peace or for attempting to break into an administrative office. But this is "radically deficient" reasoning because it utterly fails to consider the context of Ndonyi's arrest. *See id*. The IJ's curt statement fails to account for the fact that the protestors "disturbed the peace," and supposedly attempted to trespass, be-

cause they were engaged in a political rally—Ndonyi was not merely shouting obscenities or engaged in random criminal acts, but was protesting the discriminatory treatment of Anglophone students at the University. This is especially troubling considering that Ndonyi needed to prove only that her persecution was partially motivated by her political opinion. *See Gjerazi*, 435 F.3d at 812; *Mohideen*, 416 F.3d at 570.

Even more surprising is the BIA's additional reasoning that "the demonstration was not political, and they were only protesting the University's discrimination." It is difficult for us to understand how a large group protesting a pattern of discrimination targeted at a specific minority could be apolitical—to us such a demonstration epitomizes political speech. *Cf. N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 915 (1982) ("[S]peech to protest racial discrimination is essential political speech lying at the core of the First Amendment." (quoting *Henry v. First National Bank of Clarksdale*, 595 F.2d 291, 303 (1979))).

The IJ also failed to account for the severity of the response by the police, who arrived armed, *en masse*, and then raped the female students at the prison. An asylum applicant may prove her claim through circumstantial evidence. *Terezov v. Gonzales*, 480 F.3d 558, 564 (7th Cir. 2007); *Gjerazi*, 435 F.3d at 812. And the severity of the police's actions represents strong circumstantial proof of a political animus. It suggests more than mere "harassment" or harsh prison conditions, but politically charged brutality and intimidation.

Equally troubling are the IJ's and BIA's reasoning with regard to Ndonyi's prison beating in September 1999. The IJ's statement that Ndonyi "went against a soldier or a policeman and regrettably bore the brunt of his wrath for interfering while he was performing his duties," completely ignores context. The family was rounded up and arrested, and Ndonyi's father was tortured in front of her eyes, because of the family's affiliation with the CBC. To focus on the action that directly precipitated the officer's response and make no mention of Ndonyi's presence in the prison because of her affiliation with the CBC religious sect is quite disingenuous. Similarly, the BIA's determination that the beating occurred as a result of prison conditions and "circumstance" entirely ignores the events leading up to the family's experience in the prison, as well as the fact that local officials affiliated with the CNBC.

Thus, we do not believe that the evidence, considered as a whole, supports the IJ's or BIA's determinations that Ndonyi did not suffer past persecution on account of an enumerated ground. The BIA ignored two recent cases on the doctrine of "mixed motives," and bluntly asserted that the IJ had correctly reasoned the issue. The decisions were not supported by substantial evidence and the facts in the record compel a contrary result.

"[O]nce past persecution is shown, the burden shifts to the government to establish that the alien lacks a well-founded fear of future persecution." *Cecaj*, 440 F.3d at 900; *see also* 8 C.F.R. § 208.13(b)(1). The IJ did not adopt this burden-shifting approach because she found

that Ndonyi was not credible and had not suffered past persecution. But the BIA stated, in the alternative, that "even accepting that the past events in their totality amounted to past persecution on account of an enumerated ground," Ndonyi did not have a well-founded fear of future persecution because Ndonyi remained in Cameroon for several months without incident and internal relocation is a plausible option.

"The immigration regulations contemplate two separate inquiries to determine whether an applicant could reasonably relocate within his home country: (1) whether safe relocation is possible, and if so, (2) whether it would be reasonable to expect the applicant to safely relocate." *Oryakhil*, 528 F.3d at 998; *see also* 8 C.F.R. §§ 208.13(b)(2)(ii), 208.13(b)(3)(i). We therefore ask whether safe relocation was both (1) possible and (2) reasonable for Ndonyi, bearing in mind that it is the government's burden to establish these facts in this case. *See Oryakhil*, 528 F.3d at 998; *Cecaj*, 440 F.3d at 900.

On this record, it is very difficult for us to discern how relocation within Cameroon would be either possible or reasonable for Ndonyi. Ndonyi's testimony, and the State Department's 2001 and 2002 *Country Reports on Human Rights Practices* in Cameroon, evince a national hostility toward Anglophones. And the affidavit from the missionary corroborated Ndonyi's testimony regarding the severe backlash against her family due to her father's allegiance with the CBC. Thus, we cannot say that Ndonyi can safely return to the northwest province because she might face backlash there, and it is

unreasonable to expect her to relocate to another part of the country: she has no known family anywhere else in Cameroon, all but one other province is dominated by French speakers, and Anglophones are relegated to an inferior class status. *See Oryakhil*, 528 F.3d at 1000 ("The immigration regulations set out several factors in determining whether a relocation is reasonable, including 'any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.'" (quoting 8 C.F.R. § 208.13(b)(3))). In fact, the reports confirmed that life would not be easy for Ndonyi even in the Anglophone parts of Cameroon: "[N]atives of the two Anglophone provinces, the Northwest and Southwest Provinces . . . have suffered disproportionately from human rights violations committed by the Government and its security forces."

The government presented no evidence to refute Ndonyi's testimony, or the other corroborating evidence in the record, that suggests that Ndonyi cannot reasonably relocate within Cameroon. And the BIA did not specifically address any of Ndonyi's evidence. Instead, it appears to have shifted the government's burden onto Ndonyi. The BIA stated, "We acknowledge her testimony that she will face discrimination . . . and the evidence indicating that Anglophones have historically had issues in Cameroon . . . . While these factors are not insignificant, we do not find proof of a level of hardship which would establish that internal relocation would be unreasonable." Therefore, the BIA's

alternative holding was both substantively erroneous, and premised on a legal error. Based on this record, the government did not rebut the presumption that Ndonyi has a well-founded fear of persecution if she returns to Cameroon. *See Cecaj*, 440 F.3d at 900.

### III. CONCLUSION

We GRANT the petition for review of the order of removal, VACATE the order of removal, and REMAND for further proceedings consistent with this opinion.